TEXAS HARVESTER CO. v. WILSON-WHALEY CO. (No. 8896.)

(Court of Civil Appeals of Texas. Ft. Worth. June 22, 1918. On Rehearing, March 15, 1919.)

1. LIMITATION OF ACTIONS ⬤⇒28(1) — TWO YEARS' STATUTE—FRAUD.

An action for fraud and deceit is subject to the bar of limitations of two years under Vernon's Sayles' Ann. Civ. St. 1914, art. 5687, subdiv. 4.

2. LIMITATION OF ACTIONS ⬤⇒197(2)—FRAUD —CONCEALMENT—SUFFICIENCY OF EVIDENCE.

Evidence *held* sufficient to sustain plaintiff's plea that defendant concealed fraud in sale of machines until within two years of suit brought, by further misrepresentations and that plaintiff was not negligent in being misled by such representations.

3. LIMITATION OF ACTIONS ⬤⇒104(1)—STATUTE OF LIMITATIONS — FRAUD — CONCEALMENT.

Cause of action for fraud of buyer of peanut threshers was not barred by the two-year statute of limitations, Vernon's Sayles' Ann. Civ. St. 1914, art. 5687, subdiv. 4, where falsity of original representations of seller's agent was concealed by further misrepresentations, whose falsity was not discovered until within two years of suit brought.

4. FRAUD ⬤⇒59(3)—DAMAGES.

Measure of damages recoverable by buyer of peanut threshers from seller for fraud and deceit was difference between the amount paid and the value received.

5. FRAUD ⬤⇒35—RIGHTS OF BUYER—WAIVER OF GUARANTIES.

Right of buyer to recover damages for fraud and misrepresentations was not waived because, before purchased machines were shipped to buyer, seller notified it that shipments would not be made unless buyer would waive all guaranties, condition to which buyer agreed and accepted machines.

6. FRAUD ⬤⇒35—RIGHTS OF BUYER—RETENTION OF PROPERTY.

Buyer of machines did not waive its right to recover damages for fraud from seller by electing to retain machines after discovery of fraud and to claim damages, evidence showing that in so retaining machines buyer had no intention to waive its claim for damages.

7. APPEAL AND ERROR ⬤⇒742(1)—PROPOSITION NOT GERMANE TO ASSIGNMENT.

A proposition not germane to the assignment of error does not merit consideration.

8. FRAUD ⬤⇒35—WAIVER BY RENEWAL OF NOTES.

Buyer of machines under misrepresentations did not waive its right to recover damages for fraud from seller by its renewal of purchase-money notes after discovering fact that machines had been misrepresented by seller's agents; buyer having had no intention of waiving its claim for damages.

9. INTEREST ⬤⇒39(4)—EXCESSIVE ALLOWANCE —TIME OF PAYMENTS.

In buyer's suit against seller for fraud, where considerable portion of sum paid by buyer for repairs was expended during summer of 1915, and some installments of price were paid as late as 1916, trial court improperly allowed buyer interest from January 1, 1915, on all sums paid seller on price, and also on all sums paid out for repairs.

10. JUDGMENT ⬤⇒314—JURISDICTION TO CORRECT — EXPIRATION OF TERM — AMOUNT AWARDED.

After adjournment of term during which judgment was rendered, trial judge lost all jurisdiction to correct error in allowing excessive interest.

## On Rehearing.

11. FRAUD ⬤⇒20—RELIANCE ON REPRESENTATIONS—NEGLIGENCE.

Where peanut threshers were sold under misrepresentations, and, after machines in hands of buyer's customers did not work satisfactorily, seller's agent told buyer that it was on account of wet season, rank vines, and inexperienced operators, seller cannot insist, when sued for damages from the original fraud, that buyer was guilty of negligence in being deceived by subsequent fraudulent representations.

12. APPEAL AND ERROR ⬤⇒1033(8)—FAVORABLE ERROR.

If trial court gave seller of machines, sued by buyer for damages from fraud, credit for what buyer received from farmers who bought machines from it, seller cannot complain; it having profited to that extent.

13. APPEAL AND ERROR ⬤⇒932(1)—PRESUMPTIONS FAVORING COURT BELOW—BUYER'S ACTION FOR DAMAGES.

On seller's appeal, in buyer's action for damages for fraud, Court of Civil Appeals must presume that seller was given credit for land, which buyer received in part payment for one of the machines, at the agreed value of the land, and that the same was its market value.

14. COSTS ⬤⇒234 — APPEAL — REDUCTION OF JUDGMENT.

Where amount of recovery by plaintiff appellee in trial court has been reduced by judgment in Court of Civil Appeals, costs of appeal will be taxed against appellee.

Appeal from District Court, Comanche County; J. H. Arnald, Judge.

Suit by the Wilson-Whaley Company against the Texas Harvester Company. From judgment for plaintiff, defendant appeals. Reformed and affirmed.

Cockrell, Gray, McBride & Odonnell, of Dallas, and Callaway & Callaway, of Comanche, for appellant.

A. E. Hampton, of De Leon, H. N. Goodson, of Comanche, and Theodore Mack and David B. Trammell, both of Ft. Worth, for appellee.

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Opinion.

DUNKLIN, J.    The Wilson-Whaley Company, a private corporation doing business in the town of De Leon, Comanche county, purchased from the Texas Harvester Company another private corporation seven Sterling peanut threshing machines. The Wilson-Whaley Company was conducting a mercantile business in the town of De Leon, and as a part of its business was engaged in selling farm machinery to farmers in that vicinity, and the threshing machines were purchased to supply its customers.

This suit was instituted by the Wilson-Whaley Company against the Texas Harvester Company to recover damages for alleged fraud and deceit practiced upon it through defendant's duly authorized agents, R. E. Harris and C. M. Fouts, in the sale of those machines; and from a judgment in plaintiff's favor the defendant has appealed.

The case was tried without a jury, and the trial judge filed findings of fact and conclusions of law, which are as follows, eliminating therefrom useless repetitions of such expressions as "I find that," but otherwise quoting the findings literally, to wit:

### Findings of Fact.

"The defendant, the Texas Harvester Company, is a corporation duly incorporated under the laws of the state of Texas; and at all the times alleged in the plaintiff's second amended petition, R. E. Harris and M. C. Fouts were the legal representatives and agents of said defendant corporation, with full power and authority from said corporation to perform the acts, and bind the defendant, as is alleged in the plaintiff's second amended petition.

"(2) On or about April 1, 1914, the plaintiff Wilson-Whaley Company was a private corporation, with its principal office in De Leon in Comanche county, Tex., and at such time continuously to this date was engaged as a general mercantile corporation.

"(3) On or about April 1, 1914, R. E. Harris and C. M. Fouts, as legal representatives and agents of the Texas Harvester Company with full authority, did induce the plaintiff, the Wilson-Whaley Company, to make a contract with the Texas Harvester Company for the purchase of Sterling peanut threshers, complete, which consisted of a separator, and engine and other attachments on one frame; and the representations of fact made by said agents to the plaintiff, and on which it relied, that induced it to enter into said contract, were as follows, to wit:

"(A) That Heebner & Sons were manufacturers, or controlled the manufacture of all the peanut threshers that were being sold in this section of the country, such as the Little Giant, Champion, and Sterling.

"(B) That the Sterling was the best peanut thresher that was being manufactured; that it classed a grade A1, and that it was a better and more durable peanut thresher than any other kind and make of peanut threshers; that it was a peanut thresher that had been thoroughly tried and tested, and was the very best peanut thresher in workmanship, material, construction, and service that was being sold by any one; and that, if plaintiff would purchase the Sterling thresher, it would have the best peanut thresher that was on the market.

"(C) That defendant had bought out and controlled the output of the manufacturing business of Heebner & Sons, and the products that said business controlled; and that said defendant was going to discontinue the manufacture of all peanut threshers, except that of the Sterling, and would discontinue the manufacture of the Champion and Little Giant peanut threshers, and repairs for the same; and that, if plaintiff entered into the contract with defendant to handle the Sterling threshers, plaintiff would not only have the best thresher that was on the market, but would have the only one that would be sold in any of the peanut territory in the future, and that if plaintiff handled any other make of peanut thresher, and particularly the Little Giant, or the Champion, on account of the fact that all other makes of peanut threshers, and particularly the Little Giant and Champion, were to be discontinued and not thereafter be manufactured, plaintiff would be unable to buy from any one extras and repairs for any other peanut thresher, except the Sterling, after the 1914 and 1915 peanut season.

"(D) That the Sterling peanut thresher would thresh from 400 to 600 bushels of peanuts per day.

"(E) That defendant would have stationed at De Leon, Tex., an expert operator to look after the proper operation of said machines.

"(F) That defendant guarantied all of said threshers to be made of good material, and to do good work and to be first-class in point of construction, workmanship, and material.

"(G) That the defendant exhibited to plaintiff a catalogue showing cuts of said machine and the principle on which they were constructed and operated, and which cuts showed the operating principle of the shaker to be a motion and movement longitudinally with said machine.

"(4) Each and all of the representations set out in finding No. 3 was represented and stated to the plaintiff by the defendant as a statement and representation of fact.

"(5) The plaintiff was entirely ignorant and unskilled with reference to peanut threshers, and had no experience whatever relative thereto; and it acted solely and alone upon the representations of fact made to it by the defendant, as set out and stated in finding No. 3, supra; and but for each and all of said representations of fact the plaintiff would not have acted, and entered into said contract.

"(6) Each and all of the representations of fact set out in finding No. 3, supra, were each and all material representations of fact, inducing the contract on the part of the plaintiff, and but for a belief and reliance in each and every one of said representations the plaintiff would not have contracted.

"(7) Each and every one of the representations of fact alleged in the plaintiff's second amended petition, and set out in finding No. 3, supra, were made by the defendant to the plaintiff in Comanche county, Tex., and induced solely thereby, the defendant contracted and acted to its damage, in Comanche county, Tex.

"(8) Each and all of the representations of fact set out in finding No. 3, supra, were affirm-

atively false and fraudulent, at the time they were made in Comanche county, Tex.

"(9) The plaintiff, after the use of the diligence required by law, only discovered said fraud practiced on it, in the month of July, from July to November, A. D. 1915.

"(10) Induced solely and alone upon said representations of facts set out in finding No. 3, supra, and, relying thereon, the plaintiff, prior to May 15, 1914, contracted with the defendant for the purchase of seven Sterling peanut threshers and equipments complete; and, authorized by said defendant, the plaintiff made the same representations of fact to its customers, and prior to May 15, 1914, had sold by valid contracts said seven peanut threshers to its customers.

"(11) All of said contracts were complete and consummated contracts, induced by a belief and reliance on said representations of fact set out in finding No. 3, supra, and were complete and consummated and became valid and complete and binding contracts prior to May 15, 1914.

"(12) The defendant agreed to at its cost repair said machines, and authorized the plaintiff to have said repairs made at its cost, and also furnish at its cost certain extra trucks, belting, and repairs.

"(13) Acting under said representations and the contract made in reliance thereon, the plaintiff purchased from the defendant seven threshing outfits complete, consisting of separator and attachments and engines and equipments, mounted on one frame, and for which the plaintiff paid to the defendant the sum of $3,365.61. On account of freight on said seven machines the plaintiff paid the sum of $350. For extras and express the plaintiff paid $242.02. For seven extra trucks the plaintiff paid $190. For work and labor the plaintiff paid $193.86. For extra belting the plaintiff paid $147. For certain extras on the thresher sold to Johnson the plaintiff paid $24. All of the items paid out by plaintiff on the accounts above stated aggregate the sum of $4,512.49.

"Each and all of the items and expense above stated was divided and authorized by the defendant to the plaintiff, that the plaintiff should pay on account of the defendant, and that the defendant would make good to the plaintiff such expenditures.

"(14) The plaintiff has received, on account of the sale of said machines, the sum of $2,023, and, except for said amount said machines, or any note or notes taken in payment therefor, are absolutely worthless and have no market value, and the consequent damage to the plaintiff is the sum of $2,489.49, with interest thereon at 6 per cent. from January 1, 1915.

"(15) None of the representations of fact set out in finding No. 3, supra, existed at the time they were made, nor since; and the defendant failed in each and every instance so far as said representations of fact were concerned; and each and every one of said representations of fact were false and fraudulent; and each and every representation of fact, being false and fraudulent contributed to and resulted in damage to the plaintiff; and, unless the plaintiff had believed and relied on each and every one of said representations of fact, it would not have entered into said contract.

"(16) In order that there may be no misunderstanding as to the machine and threshing outfits considered by the court in these findings of fact and for which damages are allowed, I will state that the respective machines and outfits of which Robbins, Smith, Collins, Northcutt, Alexander & Lock, and Johnsons, and Copelands became the purchasers (the Copeland machine, after having been taken back, was sold to Tolar) are the machines and outfits considered by the court in these findings of fact.

"(17) That it may more clearly appear the amount received by plaintiff from the respective purchasers thereof, I will say that I have considered and allowed the following: On the Robbins machine there was paid $65. On the Walter Smith machine was paid $100. On account of John Northcutt machine was paid $468 (said amount being $865 less $197). On the Alexander & Lock machine was paid $300. On the Copeland machine was paid $65. On the J. J. Collins machine was paid about $560. On the Tolar machine was paid $465 (being all of the purchase price paid except $200)—making a total receipt and payment on said machines of $2,023.

"I have allowed the defendant credit for the above items aggregating the amount last above stated.

"(18) It is fair to state that after plaintiff's order was received by the defendant's agents in De Leon, Tex., and by them sent to the home office, the defendant declined to ship at once the threshing machines covered by said order, but instructed their agents to inform the plaintiff that goods would not be shipped unless warranty or guaranty was waived. The defendant's agents, Harris & Fouts, conveyed this information to J. B. Wilson, but not to any of the purchasers of any of the threshing machines to whom the same had already been sold as purchasers under the plaintiff company. The plaintiff was, however, informed that shipment of these machines, either to the plaintiff or its customers, would not be made unless warranty or guaranty was waived. Under these circumstances, and in order to secure the shipment of machines to plaintiff for the benefit of its customers to whom sales had already been made, by and through the assistance of Harris & Fouts, the defendant's agents, J. B. Wilson did sign a new order for machines, on which was indorsed the words, 'Guaranty waived.' It appears from the evidence that, while plaintiff's orders for the machines containing the warranty had been sent in on a former date, the machines were not shipped by the defendant company until the last order containing the waiver of guaranty had been received by the defendants. No consideration, however, was paid or accrued to the plaintiff for the signing of the waiver in question, and no retraction or withdrawal of the representations made by Harris & Fouts was made, either to the plaintiff or any of its customers who were purchasers of the machines from plaintiff by reason of the representations made by Harris & Fouts, who acted with the plaintiff in the sale of the machines in question to its customers.

"(19) On the trial of the case the plaintiff elected to rest its case on its action for fraud, and in making these findings of fact and conclusions of law subsequently made herein, I have not considered the warranty or guaranty as pleaded by the plaintiff, but have based this

judgment solely on the ground of the fraudulent statements and representations made by the defendant through its agents, Harris & Fouts."

## Conclusions of Law.

"(1) The acts and representations of the defendant, the Texas Harvester Company, by its duly authorized agents, Fouts & Harris, as complained of in plaintiff's second amended petition, and as set out in finding of fact No. 3, constituted actionable fraud, and were committed in Comanche county, Tex.; and the venue of this case is properly laid in Comanche county, Tex., and this court has the right to try said cause, and accordingly I refuse to sustain the defendant's plea of privilege and overrule the same.

"(2) Each and all of the representations of fact made by the defendant's agents to the plaintiff in Comanche county, Tex., were material; and, acting and relying thereon, the plaintiff was induced to contract, to its damage.

"(3) The plaintiff, after due diligence, only discovered said fraud in from July to November, 1915; and therefore, this suit having been filed on March 3, 1917, the plaintiff's cause of action is not barred by the two-year statute of limitation.

"(4) As all of the representations of fact set out in finding of fact No. 3 above were material, and were solely relied upon and believed by the plaintiff, and the plaintiff was induced to contract thereby, and the same in each and every instance being false and fraudulent, the same constitutes actionable fraud, and the plaintiff is entitled to recover from the defendant the amount shown on account thereof in the findings of fact.

"(5) The plaintiff is entitled to recover of the defendant its actual damage, which is the sum of $2,489.49, with interest thereon at 6 per cent. per annum, from January 1, 1915, up to the date of this trial (which was May 28, 1917), and which principal and interest to May 26, 1917, amount to the sum of $2,849.15.

"(6) The defendant, the Texas Harvester Company, a corporation, is liable in actual damages to the Wilson-Whaley Company, a corporation, on account of the matters pleaded in the second amended petition of the plaintiff, and on account of the matters set out in the findings of fact, in the sum of $2,849.15, with interest thereon from May 28, 1917, at 6 per cent. per annum, and all cost of this suit, and judgment will be entered accordingly."

Plaintiff alleged that on or about April 1, 1914, the peanut industry was in its infancy in the De Leon community and its officers and agents were inexperienced and unfamiliar with it, and were unable by personal investigation and examination of peanut threshers to determine their value or merits or demerits; and the defendant was familiar with such machinery and with the kind and character suited and adapted to threshing peanuts, and knew of plaintiff's inexperience and lack of such knowledge. Plaintiff further alleged the facts found by the trial judge set out above upon which the judgment was predicated in plaintiff's favor. The defendant by special exception presented the statute of limitation of two years to plain-

210 S.W.—37

tiff's suit. The defendant also by general denial put in issue all the allegations of fact contained in plaintiff's pleadings. Furthermore, it specially pleaded that after the machines were first ordered by the plaintiff, but before they were shipped, the plaintiff was notified that the machines would not be shipped except with the understanding and agreement on the part of plaintiff that defendant would not guarantee them; that in reply to that notification the plaintiff agreed to such waiver; that but for such agreement the machines would not have been shipped; and that therefore plaintiff is in no position to complain of such alleged misrepresentations.

Many assignments of error are presented to the different findings of fact, but, after a careful examination of the record, we have concluded that all the findings of fact have ample support in the evidence, save and except that the evidence shows that two of the threshers were ordered during the latter part of the year 1914, and only five of the machines were contracted for prior to May 15, 1914. But this error in subdivision No. 10 of findings of fact is immaterial, in view of the further finding that the misrepresentations complained of induced the purchase of all the machines. Accordingly, all of appellant's assignments of error predicated upon the contention that certain findings pointed out in the assignments are contrary to the undisputed evidence or that they are without sufficient support in the evidence are overruled without undertaking to discuss those assignments separately.

[1] This suit was instituted on March 3, 1917, and, as noted above, was a suit for damages for the fraud and deceit practiced upon the plaintiff and found by the trial judge. It will be noted, further, that the contract for the sale of five of the threshing machines was entered into on or about April 1, 1914, more than two years prior to the institution of the suit. It is settled by the decisions of this state that such an action as this is subject to the bar of limitation of two years under and by virtue of subdivision 4, art. 5687, Vernon's Sayles' Tex. Civil Stats. See Gordon v. Rhodes & Daniel, 102 Tex. 300, 116 S. W. 40; Howell v. Bank of Snyder, 158 S. W. 574; Bostick v. Heard, 164 S. W. 36.

[2] In support of the contention that J. B. Wilson, president of the Wilson-Whaley Company, was informed of the defects in the machines complained of in this suit during the latter part of 1914, and during the earlier part of the year 1915 his testimony given on the trial is referred to. He testified as follows:

"Right here from the very beginning we had trouble with those Sterling peanut threshers. It was continuous trouble, practically every day, first one and then the other, sometimes all of them, was making complaint. The complaint

about the machines were that they just simply would not run and would not do the work, and would tear all to pieces you might say. * * *

"I found, in addition to the machines running different to other machines by having this cross-motion, that it was built of very soft pine wood. It was put together with very small screws. They would stand from two to three hours' to a week's hard work, and would come all to pieces. That is, the separator and wood work that I am talking about. When I became convinced of these conditions as to the quality and workmanship of this Sterling thresher, I told Harris and Fouts that they were not even built after the pattern of a peanut thresher, and they admitted it to me, too. * * *

"They began threshing peanuts about the 1st of October. I judge it was about the 1st of November or later when I went out and saw that they were not any account and not even built like a peanut thresher. It had been running over a month when I went out and made the investigation and come to that conclusion for myself. * * *

"The Sterling never did do good work. I do not believe any of my customers ever did get an average of 100 bushels per day, or 150, anyway. There would be three days at a time that they would get less than 100 bushels. * * *

"As a result of this connection with the Sterling peanut thresher our firm lost a number of customers. Our customers felt we ought to stand by them in place of the Texas Harvester Company. Those who owned machines thought so, and their friends thought so, and the result was they quit our firm. It is just a question of who did not quit trading with us. Our customers began quitting us when they began to thresh their peanuts in the fall of 1914. * * *"

Several of the purchasers of machines from the plaintiff were also introduced by the plaintiff, and testified, as did J. B. Wilson, president of the company, with respect to the failure of the machines to do satisfactory work, and that complaints were made by them to Wilson of that fact; such complaints being continuous from the time the machines were first used, beginning in the fall of 1914. Such proof was uncontroverted, and, standing alone and independent of any other issues, it would clearly establish the defense of a bar of the suit under the statute of limitation referred to above.

However, it was proven beyond controversy that plaintiff's president and general manager, J. B. Wilson, was ignorant of the construction and merits of peanut threshing machines generally, and that in contracting to purchase the machines in question he relied solely upon the representations made to him with respect thereto by defendant's agents, Harris and Fouts. He further testified as follows:

"Immediately after I began hearing complaints in the fall of 1914 as to the defects of the Sterling peanut thresher I sent for Fouts and Harris, and ask him to go out and look at them, which they did in a number of cases, and I asked them to send me an expert man who knew how to operate them, and after they came and went out there they reported to me in every instance that that was an unusual season, that we had had excessive rains and had such heavy vines, and they said the machines had not a proper and fair test and said that the people who were operating them were brand new as to peanut threshers, and did not know how to operate them, and they said the reason the machines were not giving satisfaction is because of the weather and because of the men's inexperience who were operating them, and I believed them. Knowing that most of what they said were true, I believed what they said about it. I knew the vines were a little heavy, and I knew we had more rain that season than usually, and they especially impressed on me that it would be unfair and unjust and unreasonable with the test they had had to lay down on the machine and condemn it. I certainly did believe and rely on their statements. Furthermore, in the fall of 1914 I was very busy. I did not personally go out to more than one or two of these machines, and did not stay thereon an average of 30 minutes at a time. I was buying peanuts and hogs, and was very busy in other ways, and I knew nothing about peanut machines, and could not have been of any service or benefit to them had I gone and stayed, and I told these men that I wanted to get some one who knew how to operate the machines, and I called on Fouts and Harris to furnish me the expert man that they agreed to do, and they kept promising me that they would get one, and they got a man from Dublin one time and possibly one from Dallas one time to come out. I would not be positive how long these men stayed out there, but possibly one or two or three days. Those men made the same reports to me that Fouts and Harris did; that the machines had not had a proper and fair test; that the men who were operating them were inexperienced; that the weather conditions were bad; that if we could have a week or two of good weather that the machines would get up and run all right; that this was the only place that the machines were giving any trouble; and that nobody else was having any trouble. I believed what they said because I did not know of any one else having trouble and did not have time to investigate it. I believed and relied on those statements. In the spring they went out with me, and we went to every customer to whom we had sold machines, and made two or three places per day, and went to Smith's and Robbins' and to Glover's, and it took us two or three days to make these rounds, and I would tell him I had been talking to those people, and it was up to him to tell them what to do, and Fouts and Harris did the talking, and they told each and every customer that anything that was reasonable and right they would do, and said they were perfectly willing to put on separate trucks and make any adjustments necessary; that last season was a bad one; and they said if we could have an average season they would show them that they would do good work, and I believed them. In carrying out that agreement that these men made to customers as to furnishing repairs I had the customers to bring their machines in, and I ordered Heebner & Sons something like $300 worth of extras through the Texas Harvester Company, and Cain and Short and Smith worked for months on those machines, repairing them. I then tried to resell

the machines and could not do it, and I put these three out that were turned back to me, and I put them out with Mr. Cain, who professed to be an expert with threshing machines, and he guaranteed me that he could do it, could run them, and I have related the success he had with them."

He further testified that he had been dealing with defendant company for several years, and had implicit confidence in any representations their agents made, and that he was not fully convinced of the deception that had been practiced upon him until some time during the months of July or August, 1915. C. M. Fouts, one of defendant's agents who sold the machines to the plaintiff, testified as follows:

"Of course we were anxious that Wilson-Whaley Company make good collections, and that the customers would be well satisfied, so that the company could collect and pay us what they owed us. These complaints came in, in the fall of 1914, pretty regular. We had complaints from the customers, and heard complaints from Wilson-Whaley Company. I told the customers their troubles were partly due to the inexperienced men that were running them, also heavy vines and wet peanuts. Some of them told me about the machines shaking to pieces. I do not know whether Robbins did or not. Some of them did. Some of them told me that the machines practically shook to pieces. Some of them told me that they had to catch the nuts in the tubs. When they told me that, I told them it was because of wet weather and heavy vines and inexperience, while we had a few that got along all right. Q. Did you tell them or not that you believed the machine was all right. A. I don't know that I said anything about it. I did tell them that I thought with a fair test the machines would prove satisfactory. Q. Did you suggest to give the machine a fair test under normal conditions, good weather and peanut crop conditions, and experienced operators before they began to kick about it? A. I told them that we had some in the territory that was giving satisfaction. They had experienced men, and, although they had lots of rain, too, still they would not try to thresh when it was too wet. I told the parties to keep the machines till the next fall and give them a fair test, and told them that the trouble was not in the machines. Yes; I told them that. No doubt but what I told Mr. Wilson that. I do not remember. There is no reason why I should not have told him that. In fact I did tell Wilson that from the complaints I had heard and from observation it was my belief that the fault was not in the machine at all; told him it was due to the inexperience of the operators and the wet peanuts, and if the machines had had a fair test they would have turned out all right. I told him it was all those things that shook the machine to pieces. Yes; I told Wilson that."

This proof was ample to support the plaintiff's plea, which was sustained by the trial court, and which was, in effect, that the defendant concealed the fraud and deceit in the sale of the machines until July or August in the year 1915 by further misrepresenta-tions that the failure of the machines to do good work was not due to any defects therein, but was due to the inexperience of the operators and to weather conditions. The proof was sufficient to support the further plea and finding sustaining it that plaintiff was not guilty of negligence in being thus misled by such further misrepresentations.

In the case of Texas & Pacific Railway Co. v. Gay, 86 Tex. 608, 26 S. W. 614, 25 L. R. A. 52, our Supreme Court said:

"The rule in this state is that the fraudulent concealment of a plaintiff's cause of action takes the case out of the bar of statutes of limitation. Munson v. Hallowell, 26 Tex. 475 [84 Am. Dec. 582]; Ripley v. Withee, 27 Tex. 17; Ransome v. Bearden, 50 Tex. 127; Calhoun v. Burton, 64 Tex. 515; Anding v. Perkins, 29 Tex. 348; Connoly v. Hammond, 58 Tex. 17; Brown v. Brown, 61 Tex. 45. The limitation on this rule is, that a plaintiff cannot excuse his delay in instituting suit on the ground of fraudulent concealment of his cause of action, if his failure to discover it is attributable to his own neglect; and whether such neglect existed in a given case must be determined from the facts of that case."

In 17 Ruling Case Law, § 220, p. 862, the following was said:

"The mere failure of a party to disclose a fact is not necessarily a fraudulent concealment, except in those transactions which are in their very nature intrinsically fiduciary and involve a condition of absolute good faith; but it is only silence which is permitted, as any statement, word or act, which tends to the suppression of the truth renders the concealment fraudulent. In such cases, by adding to the original fraud affirmative efforts to divert or mislead or prevent discovery, a continuing character is given to the original act which deprives it of the protection of the statute until discovery."

In the case of Larson v. McMillan, 99 Wash. 626, 170 Pac. 324, the Supreme Court of Washington said:

"The law binds a party to the exercise of no more than 'ordinary care' and 'reasonable diligence,' and the wrongdoer cannot set up a lack of care or diligence when, by his concealment, he has lulled his victim to sleep upon his rights. The law intends that no one shall profit by his own fraud, or that the statute shall be seized upon as a means whereby a fraud is made successful and secure."

[3] Accordingly, appellant's assignments to the failure of the court to sustain its defense of the statute of limitation of two years are overruled.

[4] The true measure of plaintiff's damages was the amount of its losses resulting directly and proximately from the fraud practiced upon it, and that was the rule followed by the trial court. George v. Hesse, 100 Tex. 44, 93 S. W. 107, 8 L. R. A. (N. S.) 804, 123 Am. St. Rep. 772, 15 Ann. Cas. 456.

We are of the opinion, further that the evidence was sufficient to sustain the finding that the machines and all portions thereof

which were returned to the plaintiff by such purchasers are worthless, and that by reason of their worthlessness the notes given by the purchasers therefor to the plaintiff and uncollected are legally uncollectable, and therefore also worthless.

[5] As plaintiff's suit was for damages for fraud and deceit practiced in the sale of the machines, its right to recover damages for such fraud was not waived by the fact that before the machines were shipped to the plaintiff the defendant notified the plaintiff that such shipments would not be made except upon the condition that plaintiff would waive all guaranties of the machines, and that plaintiff agreed to that condition and accepted the machines under such an agreement. In 20 Cyc. p. 60, the following is said:

"Where the vendor positively misrepresents a material fact which is peculiarly within his own knowledge and of which the purchaser is ignorant, the fact that he refuses to give a warranty is not inconsistent with his liability for fraud, although it is proper to be considered by the jury in determining whether the purchaser relied on the misrepresentations and was deceived thereby."

[6] That rule was followed in Cabaness v. Holland, 19 Tex. Civ. App. 383, 47 S. W. 379, by the Court of Appeals of the Third District, in which a writ of error was denied by our Supreme Court. See, also, the following decisions which we construe as essentially to the same effect. Rumeley Products Co. v. Moss, 175 S. W. 1085; Jones v. Montague, 158 S. W. 1053, and other decisions therein cited. Nor was there any waiver of such right by the act of the plaintiff in electing to retain the machines after discovery of the fraud and to claim damages for such fraud; the evidence being sufficient to show that in so retaining the machines plaintiff had no intention of waiving its claim for damages for the deceit practiced. Grabenheimer v. Blum, 63 Tex. 369; Kennedy v. Bender, 104 Tex. 149, 135 S. W. 524; Winters v. Coward, 174 S. W. 940; Hubbs v. Marshall, 175 S. W. 716..

[7, 8] Under the fourteenth assignment of error complaint is made that by plaintiff's acceptance of the machines after its agreement to waive all guarantees of them it waived any right to claim damages for the alleged fraud and deceit, appellant submits a proposition in which it is insisted further that the plaintiff should be held to the same waiver by reason of its renewal of the purchase-money notes given for the machines after discovering the fact that they had been misrepresented to it by the defendant's agents Fouts and Harris.

That proposition is not germane to the assignment, and therefore does not merit consideration. Furthermore, under the authorities last cited, it is without merit.

[9] The trial court allowed plaintiff interest from January 1, 1915, on all the sums paid to the defendant as a purchase price for the machines, and also on all sums paid out by the plaintiff for repairs on the machines. The proof shows without controversy that a considerable portion of the sums so paid out for repairs was expended during the summer of 1915, and that some of the installments of the purchase price of the machines were paid as late as during the year 1916.

By reason of such proof appellant insists that an excessive amount of interest was allowed, and we are of the opinion that this assignment should be sustained.

To meet the assignment appellant has filed a remittitur of all interest allowed from January 1, 1915, up to January 1, 1917, and has asked that the judgment be so reformed as to eliminate the interest so remitted, which will be done.

For the reasons indicated above, all other assignments of error are overruled, and the judgment of the trial court will be so reformed as to allow plaintiff damages in the sum of $2,489.49, with interest thereon at the rate of 6 per cent. per annum from January 1, 1917, to date of trial in the lower court, to wit, May 28, 1917, amounting to the sum of $60.93, making a total of the judgment which should have been rendered by the trial judge and which is here rendered in plaintiff's favor for the sum of $2,550.42, with interest thereon from May 28, 1917, at the rate of 6 per cent. per annum.

[10] But no motion for new trial was filed in the lower court by the defendant calling the court's attention to the error in allowing such excessive interest. The proof being so conclusive, it is entirely unreasonable to suppose that the trial judge would have failed to correct the error, which apparently was an oversight. We find in the record a bill of exception to the allowance of such excessive interest, but the bill was not presented to the trial judge until after adjournment of the term of court during which the judgment was rendered, and hence after the trial judge had lost all jurisdiction to correct the error.

Under such circumstances the costs of appeal will be taxed against appellant rather than against appellee, as would otherwise have been done. Haley v. Gatewood, 74 Tex. 281, 12 S. W. 25; Adams v. State, 146 S. W. 1086; Texas & Pacific Ry. Co. v. Graffeo, 53 Tex. Civ. App. 569, 118 S. W. 873; Blain v. Lowery, 120 S. W. 247; Davidson v. Wills, 56 Tex. Civ. App. 548, 121 S. W. 540.

Reformed and affirmed.

CONNER, C. J., not sitting, serving on writ of error committee at Austin.

## On Rehearing.

DUNKLIN, J. Appellant insists that in view of the testimony of plaintiff's president

and general manager, to the effect that about November 1, 1914, he discovered that the machines were of no value, it was conclusively shown that he did not exercise due diligence to discover the fraud practiced upon him in the sale of the machines prior to July, 1915, and that therefore the plea of limitation was conclusively established. As shown in the court's findings of fact, referred to already in our original opinion, appellee's manager was wholly unfamiliar with peanut threshers, and relied entirely upon the representations made to him by appellant's agents. The manager further testified that after reaching the conclusion that the machines were not as represented, he notified appellant's agents, who assured him that he was mistaken in that conclusion, and that the trouble complained of by the purchasers was not due to any fault in the machines, but to the wet season, rank vines, and inexperienced operators; that the purchasers in all other vicinities were having no trouble in operating such machines.; that the machines were all right, and would be proven so upon having a thorough test; that it would be unjust, unreasonable, and unfair to appellant not to give them a fair trial; that appellee's manager was thereby induced to comply with the request so made; and that testimony of the manager was corroborated by the testimony of appellee's agents.

[11] The trial judge found that all of the representations made in order to induce appellee to purchase the machines were false and fraudulent. The additional representations and assurances, made to appellee's manager, and recited above, were substantially to the same effect, and were reasonably calculated to and did, induce appellee's manager to continue to rely upon the truth of the former representations, and appellant is in no position to insist now that appellee was guilty of negligence in being thus deceived by such fraudulent representations. Kincannon & Gaines v. Independent Cotton Oil Co., 196 S. W. 878; Labbe v. Corbett, 69 Tex. 503, 6 S. W. 808; Young v. Barcroft, 168 S. W. 392.

[12, 13] We are of the opinion, further, that the evidence was sufficient to support the court's finding that the machines were worthless. While there is no specific finding of their value at the time they were sold, we think that the finding of the court was intended to have that effect, since all of the testimony relative to their value was to the effect that when first tested they proved to be worthless. If appellant was given credit for what appellee received from the farmers who bought the machines, as was done, appellant is in no position to complain, since it has profited to that extent. In the absence of any finding to the contrary, we must presume that appellant was given credit for the land which appellee received in part payment for one of the machines at the agreed value of the land, and that the same was its market value.

[14] But we are of the opinion that we erred upon original hearing in taxing the cost of the appeal against the appellant, in view of the fact that, as pointed out in the motion for rehearing, the findings of fact, showing the method of computing the damages for which appellee was allowed a recovery, were not filed until after the term of court had adjourned, and hence too late for the appellant to call the court's attention to the error in estimating the damages pointed out in our original opinion. Accordingly, our former judgment will be so reformed as to tax the cost of the appeal against the appellee, in view of the fact that the amount of recovery in the trial court has been reduced by the judgment in this court, and with that correction the motion for rehearing is in all other respects overruled.

Appellant has also filed a motion for additional findings of fact. Some of the issues of fact stated in the motion were covered by the court's findings, filed below. All other material findings sought are stated in our conclusions above. In all other respects the motion for additional findings of fact is overruled.