PITCHFORK LAND AND CATTLE COMPANY ET AL V.
RAYMOND KING ET AL

No. A-7929. Decided April 12, 1961
Rehearing overruled June 14, 1961
(346 S. W. 2d Series 598)

---

*Jack W. Watson,* of Stamford, and *Kilgore & Kilgore,* of Dallas, for petitioners.

*Bullington, Humphrey, Humphrey & Fillmore,* of Wichita Falls, for respondents.

MR. JUSTICE CULVER delivered the opinion of the Court.

Respondents, Raymond King and a number of other farmers and landowners, brought this suit against Pitchfork Land and

Cattle.Company and Aerial Sprayers, Inc. for damages to their growing crops of cotton allegedly caused from herbicide effect. They alleged negligence on the part of both Pitchfork and the Aerial Sprayers in allowing herbicide chemicals to drift and settle upon their crops from spraying operations conducted on Pitchfork's land.

A jury verdict favorable to King and others was returned and judgment against both defendants entered thereon. The Court of Civil Appeals has affirmed. 335 S.W. 2d 624.

The petitioners urge that there was no evidence shown upon the issue of causation or in other words that the respondents did not offer any probative testimony tending to prove that herbicide chemicals drifted from the Pitchfork spraying operations and settled upon and damaged respondents' crops. This was so, they argue, for two reasons, first, because there was positive and undisputed expert evidence that the herbicide effect appeared too late in the cotton crops for it to be the result of the Pitchfork operations, and, second, because the fact that the general pattern of the herbicide effect shown by the undisputed evidence is not a drift pattern, and no witness testified that he was able to trace the herbicide effect from the point of spraying operations on the Pitchfork ranch to the farms where the damage occurred.

There is no question but that the crops of respondents suffered herbicide damage and this effect was first discovered by them about the first of August. The spraying operations were conducted on the Pitchfork ranch on the 14th and 15th of July. Investigation revealed that no other similar operations had been conducted during this period anywhere within a radius of 50 miles. The spraying on the Pitchfork ranch was for the purpose of killing sunflowers, cockleburs and other weeds at a distance of some 7½ miles from the nearest cotton farm which adjoins the Pitchfork land on the north. The area where the damage is claimed extends northeast, some 8 miles in a narrow pattern from 1½ to 2 miles in width.

Petitioners produced 4 qualified-expert witnesses to testify that under the crop growing conditions existing at that time herbicide effects should have been readily apparent within 7 and not more than 10 days after application. One of these from the examination of photographs of the cotton stalks taken on August 7th testified that the herbicide must have been applied

some 10 or 12 days earlier. So that if the testimony of these experts is to be accepted the herbicide must have come from some source other than from the Pitchfork lands and some 6 to 10 days after the Pitchfork spraying was finished.

Petitioners say therefore that the damage in question could not have been caused by the spraying operations because the damage would have been apparent at least 6 days earlier and this by the testimony of the experts is established as a scientific fact such as the value of a steel bridge, [1] that death resulted from polio, [2] or that irritation of the eye could not cause cancer. [3]

Conceding that the effect of herbicide on cotton plants is a subject for experts alone where the jury cannot be able to form correct opinions of their own, based upon the evidence and aided by their own experience and knowledge of the subject, [4] nevertheless there are other factors which we think exclude the consideration of this expert testimony as being controlling under the circumstances in this case.

It is conceded that the damage was caused by herbicide similar to that used by the petitioners. According to the testimony, upon contact with susceptible plants the herbicide affects the young and tender parts of the plant causing a greatly accelerated growth, depending upon the maturity of the plant and the condition of moisture and temperature at the time. The characteristic symptoms are crinkly margins and elongated lobes of the young leaves.

The testimony reveals that these farmers first discovered injury to their cotton plants about the first of August, some testifying that it was the last day or two in July and others on the first of August. At least one farmer, although he was in his cotton field every day or so, had not noticed anything abnormal until a neighbor made inquiry. Another first heard it discussed at the cotton gin. The testimony indicates that these farmers were all aroused over the situation and sought information from the Agricultural Experiment Station to determine the cause. While the experts testified that under the growth condi-

---

1. State v. Dickey, 158 S.W. 2d 844, wr. ref. w.m.

2. Lumbermen's Mutual Cas. Ins. Co., v. Vaughn, 174 S.W. 2d 1001; Travelers Ins. Co., v. Blazier, 228 S.W. 2d 217, wr. dism.

3. Scott v. Liberty Mutual Ins. Co., 204 S.W. 2d 16, wr. ref. n.r.e.

4. Coxson v. Atlantic Life Ins. Co., 142 Tex. 544, 179 S.W. 2d 943.

tions in the area at that time the herbicide effects should have been readily apparent to any observer within at least 7 days and in not more than 10 days, this cannot be taken as proof from a scientific and conclusive standpoint that the herbicide effect was not caused by the July 15th operations on the Pitchfork land. Even accepting the testimony of the experts that the effect of the herbicide would have appeared at least by the 25th of July, the fact that discovery did not take place by the farmers until on or about August 1st cannot be taken as a matter of law that there was no apparent effect for 5 or 6 days prior to its discovery by these farmers. It could well be that the effect would have been observed earlier by the expert intent upon a search for herbicide effect and yet not be discovered by farmers unacquainted with herbicide action in a casual inspection of their fields.

They also say that it is a scientific fact that the pattern of herbicide effect shown by the testimony in this case to be a long narrow strip extending for some 30 miles to a width of from a mile to a mile and a half with some damage in the center, less at the beginning and end of the strip, could not have been caused by drift of the herbicide spraying at the Pitchfork ranch. This does pose a rather difficult question. It is conceded that on the 15th of July there was a wind blowing in a northeasterly direction from the Pitchfork ranch. According to the weather bureau data offered by the petitioners taken at Childress, Texas, some 60 miles to the north, the wind was blowing generally in a northeasterly direction at a velocity of from 12 to 15 miles per hour. The penciled-in arrows on this chart do not purport to show direction with much degree of accuracy and some doubt exists as to whether conditions as to wind, velocity and direction at Childress are to be considered as of much value in determining those conditions some 60 miles south. There is some testimony given by one of the respondents that he had occasion to observe on the 15th that the wind was rather high and blowing from the direction of the Pitchfork ranch operations. The testimony offered by the petitioners is to the effect that by the observance of windmills on the Pitchfork ranch the wind was blowing more eastwardly so that it would not pass over the area claimed to be affected.

A Mr. Turner, holding a Master of Science Agricultural degree and with considerable experience in research and consultation work in connection with the application of herbicide chemicals, and in aeroplane spraying operations, mostly in Cal-

ifornia, testified that he had worked out the land contours as they relate to the Pitchfork ranch and from there on past the Finey community. He further testified that the recordings at the Childress weather station has no value whatsoever because it is much too far away; that there is a great deal of variation both in direction and velocity of winds within a relatively small area, a square mile or less, particularly where you have rolling topography; that the wind and velocity and direction at Mr. King's home would not be indicative of the condition of the wind 12 miles aways at the China draw at the same time.

Assuming the weather conditions as testified to by Pitchfork's witness as to the direction and velocity on July 15th, Mr. Turner testified the drift would not go in the direction of the Finney community but would be more to the east. He further testified that where you have a drift with any chemical similar to that used in this case there is a tendency to disperse the further it travels from the source. Even if the wind had been blowing in the direction of the Finney community the herbicide would not have traveled in a straight narrow path, but would fan out. He further testified that he had seen the path of herbicide similar to the one disclosed here, that is, a long narrow pattern 30 miles long and from one to two miles in width, but in those cases the cause had been determined to be the passage of a leaking aircraft over the area and he had seen that situation five different times.

The area affected by herbicide was, as heretofore said, in a long, narrow strip extending northeasterly in a line which, if prolonged southwesterly, would lead directly to the China draw on the Pitchfork lands where the spraying operations were conducted. It is 7 to 8 miles from the China draw to the nearest farm and in excess of 15 from the draw to the most remote farm of the plaintiffs. It is also true that the farm immediately adjoining the Pitchfork land on the northeast was affected.

■ As to the herbicidal effects from the China draw on the Pitchfork lands to the nearest farm, the testimony is somewhat confusing, but we think in considering only the testimony most favorable to the respondents the jury was justified in believing that the herbicide effect could be traced from the China draw to the nearest farm where the damage was apparent. Some witnesses observed the mesquite leaves to be yellowed and discolored on the intervening ranch lands as seen both from the air and ground. One witness testified that he walked

through the ranch to the China draw beyond and observed a pattern of yellowed mesquite leaves and shriveled-up weeds. The explanation given by the petitioners is that the discoloration of the mesquite leaves was caused by drouth and borers and that the man who walked through the ranch and saw the shriveled weeds was not acquainted with effects of herbicide. Thus, it can hardly be said as a matter of law that the jury would not be warranted in finding that the herbicidal effect on plaintiffs' farms was caused by the sprayed chemicals drifting from the Pitchfork operations. While the testimony of Mr. Turner to the effect that it would not be possible for this long, narrow pattern to be formed by herbicide drifting with the wind seems logical and to comport with common experience from the observation of, for instance, smoke drifting along with the wind, nevertheless we think the testimony does not show as a scientific fact that herbicide sprayed into a gentle breeze blowing at a velocity of about 5 to 8 miles per hour could not form the pattern of damage as shown in this case. It is to be borne in mind that Mr. Turner does not speak as a trained meteorologist but only as one who has had much experience and observation in operations of this character. We therefore overrule the petitioners' point that there was no evidence to support the jury's finding upon the issue of causation.

Pitchfork Company presents the point that there was no evidence in this case to support the jury finding that Aerial Sprayers was not an independent contractor, but that to the contrary Aerial Sprayers was acting in the capacity of an independent contractor as a matter of law. With that proposition we agree.

■ In this case there was no detailed written contract and the question must be determined largely by implication. But the elements that are undisputed, as well as those that are implied from the acts and conduct of the parties, tend to show the independent contractor relationship. Shannon v. Western Indemnity Co., Comm. App., 257 S.W. 522, 524.

Aerial Sprayers had performed similar work for Pitchfork before. The Pitchfork ranch manager called Aerial Sprayers and requested this operation. The pilot employee of Aerial Sprayers flew to the ranch on July 13th and discussed with the manager the area to be sprayed. The pilot was informed of the location of cotton farms in the vicinity and was cautioned in that respect. On the following morning the pilot and the

and the assistant manager of the ranch observed the windmills for the purpose of determining the direction and velocity of the wind and discussed the direction and distance of the cotton farms from the area to be sprayed. The assistant manager cautioned the pilot not to spray if the wind was high. After operating for a little while the pilot concluded that the velocity of the wind was too strong and decided to discontinue the work for that day. He returned early on the morning of the 15th and waited for some 20 to 30 minutes when he decided that the wind velocity had decreased to some 5 or 6 miles per hour and resumed the spraying operations, finishing up the work a little after 7 o'clock a.m. The assistant manager of the ranch did testify on cross examination that he would have stopped the spraying operations if he had thought it was endangering any of the nearby crops. The record also shows that the experts at the nearby State Experiment Station were consulted with respect to the chemical formula to be used and that their recommendations were accepted both by Pitchfork manager and by the President of Aerial Sprayers. The payment for this service was by the acre and Pitchfork furnished flagmen for the guidance of the pilot in laying out his course. The flagmen, however, were merely markers and were stationed to indicate the extend of the area. The directions for placing them were given by the pilot.

The term has been defined as "A contractor is any person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details." Industrial Indemnity Exchange v. Southard, 138 Tex. 531, 160 S.W. 2d 905. In that case we pointed out the recognized tests to determine when one is acting in the capacity of independent contractor, namely, (1) the independent nature of his business; (2) his obligation to furnish necessary tools, supplies and material to perform the job; (3) his right to control the progress of the work except as to final results; (4) the time for which he is employed; (5) the method of payment, whether by the time or by the job. Southard was advised by the Lumber Company foreman against wreckless driving and urged to obey traffic regulations. He was paid at so much per thousand feet of logs hauled. He was supervised as to the loading and unloading. Nevertheless Southard was held not to be an employee but an independent contractor as a matter of law. The Court said that: "Where there is no dispute about the controlling facts, and there is but one reasonable con-

clusion that can be inferred from such facts, the question of whether Southard was an employee or an independent contractor is one of law and not of fact."

In Dave Lehr, Inc. v. Brown, 127 Tex. 236, 91 S.W. 2d 693, the facts were very similar to those in Southard. The finding of the jury was revised and the truck owner and driver held to be an independent contractor as a matter of law and this notwithstanding that the driver was instructed to use the most practical and direct route, to observe traffic laws, to drive slowly in passing schools and churches, and was paid on a mileage basis. The opinion in that case quoted a very apt statement from Norton v. Day Coal Co., 192 Iowa 160, 180 N.W. 905, 907, as follows:

" 'There was no right to discharge because, as said, claimant had virtually the status of a drayman. Plaintiff could not tell when he came whether he would get any work. He was not obliged to accept any that was offered. He was at all times at liberty to haul for others rather than defendant. The most that could be done was to refrain from giving him coal to deliver. The only power the defendant had was to elect whether he should be given work and how long it should continue. There was the right to interrupt or terminate the contract, but not to discharge.' "

Even assuming the right of the assistant ranch manager to interrupt the pilot if he thought the wind was too high, it does not follow that he had a right to discharge the pilot or the Aerial Sprayers. In our case the pilot decided when he would begin his operations and when he should stop, how high he should fly and how the chemical should be sprayed. The admonition given him to use caution in so far as the cotton crops were concerned certainly did not indicate the relation of master and servant any more than the instruction in the truck driver cases to drive carefully and obey traffic laws, nor in those cases would the employer have been liable if the truck driver disregarding those instructions had by careless driving injured some third person.

It is undisputed that Aerial Sprayers was engaged in an independent business that required considerable skill. It was incorporated under the laws of Texas and operated some 10 planes from its base in Stamford, Texas. Over a period of 15 years the company had sprayed something like a million acres with herbicides, insecticides and fertilizers.

Aerial Sprayers furnished all of the necessary tools, supplies and material to perform the job. The pilot was in the employ of Aerial and had been for some three years. The pilot determined the time and the duration of his flights. The payment was based on the number of acres sprayed. In our opinion the tests set out in Industrial Indemnity Exchange v. Southard are fully met.

■ It has been authoritatively said that in practically all cases the independent nature of an agreement of employment may be inferred from two circumstances (1) that the party is engaged in a distinct and generally recognized employment; (2) that his stipulated remuneration is to be determined by some quantitative standard. Dave Lehr, Inc. v. Brown, supra. Those two factors predominate in this case.

■ Some emphasis is placed by the respondent on the selection of the spray formula that was used. The testimony reveals that a commercial type was recommended by the employees of State Experiment Station to the ranch manager. Later Mr. Hooper, the President of Aerial Sprayers, called the station asking about the type of chemical recommended and said that if it was recommended by the station he would "pick it up and put it out". The station had on hand a quantity of this herbicide and at the request of Mr. Hooper the employees of the station delivered 15 gallons to the plane pilot on the Pitchfork ranch. The herbicide was sold to and paid for by the Aerial Sprayers. These facts do not tend to show that Pitchfork had such control over the details of the work as to constitute the pilot or Aerial Sprayers as employees of Pitchfork. As said in Dave Lehr v. Brown, "We think the nature of the contract and the legal effect of the same can only be determined by consideration of all the facts and circumstances in the case."

Respondent cites T. & N. O. Ry. Co. v. Rittimann, 87 S.W. 2d 745, wr. er. dism., for the proposition that the relationship is determined by the right of control and not the exercise thereof. We do not disagree with that statement of the law, but what we say here is that there was neither the right of such control nor the exercise thereof. In the case cited the railroad company engaged Rittimann to operate its pumping plant and keep a supply of water on hand, the railroad furnishing all tools and facilities, the plaintiff only giving his personal service to the work. It was Rittimann's duty to keep the tank full of water, to maintain the premises in a neat and orderly condition

and to make minor repairs. All work was to be performed under the supervision and direction of defendant's superintendent. The contract expressly provided that all work performed by Rittimann should be under the supervision and direction of the railroad superintendent.

We are of the opinion that Aerial Sprayers, under the facts and circumstances of this case was an independent contractor and accordingly hold Pitchfork Land and Cattle Company not liable for negligence of Aerial Sprayers.

The judgment of the trial court and of the Court of Civil Appeals is therefore reversed and rendered in favor of Pitchfork Land and Cattle Company and affirmed as to Aerial Sprayers, Inc.