Marshall K. DOUGHERTY, M.D. d/b/a Marshall K. Dougherty & Associates, M.K. Dougherty, M.D. & Associates, and T. Jaime Molina, M.D., Appellants,

v.

Russell GIFFORD and Mary Imogene Gifford, Appellees.

No. 6–91–023–CV.

Court of Appeals of Texas, Texarkana.

Feb. 25, 1992.

John K. Vaughn, Riddle & Brown, Dallas, for appellants.

James R. Rodgers, Moore, Payne, Clem, Rodgers & Hodgkiss, Paris, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

CORNELIUS, Chief Justice.

Dougherty & Associates and Dr. Jaime Molina appeal from a judgment based on a jury verdict in favor of Mr. and Mrs. Russell Gifford in a medical malpractice action.

Dougherty and Molina raise eleven points of error, asserting that limitations, improper admission of expert testimony, and insufficiency of the evidence precluded the judgment against them. They also assert that a remittitur is required.

■ Dougherty's legal sufficiency points must be examined in the light most favorable to the jury findings to determine if there is any probative evidence supporting them, disregarding all contrary evidence and inferences. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Raw Hide Oil & Gas v. Maxus Exploration*, 766 S.W.2d 264, 276 (Tex.App.–Amarillo 1988, writ denied). If there is any probative evidence to support the findings, the point must be overruled and the findings upheld. *Southern States Transportation, Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989).

■ The factual sufficiency points require us to examine all of the evidence in the record and sustain the points only if the evidence is insufficient or if the findings are so against the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Garza v. Alviar*, 395 S.W.2d at 823; *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *Raw Hide Oil & Gas v. Maxus Exploration*, 766 S.W.2d at 276.

Gifford developed a hernia of the esophagus that worsened to the point that his family physician referred him to a specialist. The specialist, Dr. Josie Williams, took a biopsy and sent it to the pathology department of McQuistion Regional Medical Center in Paris. Dougherty & Associates had a contract to perform all pathology work for the medical center. The actual pathology work on Gifford's biopsy, however, was performed by Dr. Jaime Molina, who worked under an arrangement with Dougherty. Molina's work was done at the medical center laboratory, which Dougherty directed. Dougherty billed Gifford for the pathology services. Molina diagnosed malignant cancer, and as a result, Gifford was ordered to undergo irradiation and chemotherapy treatments.

After six weeks of treatments, a second biopsy was taken, and it revealed that there was no malignancy. Gifford was scheduled for surgery in Dallas, but it was avoided when the original biopsy slides were reviewed and determined to contain no indication of cancer.

The jury found that Molina was negligent in making the cancer diagnosis and that his negligence proximately caused Gifford's injuries, that Molina was an employee and a borrowed servant of Dougherty, that Dougherty was estopped to deny liability for Molina's work, that Molina and Dougherty fraudulently concealed Molina's part in the diagnosis, and that Gifford could not have reasonably discovered Molina's involvement before suit was filed. Damages of $1,000,000.00 to Gifford and $200,000.00 to his wife were awarded.

The relevant dates are:

February 21, 1986 First pathology report/misdiagnosis

May 1986 Gifford learns of misdiagnosis

July 10, 1986 Addendum pathology report prepared by Dougherty and Molina

August 28, 1987 Article 4590i notice letter to M.K. Dougherty & Associates

April 21, 1988 Suit filed against M.K. Dougherty d/b/a Marshall K. Dougherty, M.D. & Associates

April 27, 1988 4590i notice letter to Molina

May 8, 1988 Limitations date for February 21, 1986 (including seventy-five-day extension)

May 17, 1988 Gifford's first set of interrogatories

June 10, 1988 Dougherty's answer filed naming Molina as pathologist doing the work

July 14, 1988 Molina added to suit

September 25, 1988 Limitations date for July 10, 1986 (including seventy-five-day extension)

March 23, 1989 Dougherty filed answer indicating that he was sued in the wrong capacity

November 16, 1989 Gifford's petition amended to show M.K. Dougherty, M.D. & Associates as a professional association

The first four points of error are interrelated and are grouped for discussion.

The first point of error asserts that Gifford's claim was barred because it was not brought within two years of the misdiagnosis.[1] Suit was brought against Molina on July 14, 1988. Gifford contends that limitations should be measured from the last day of Molina's involvement in the case, which was July 10, 1986, when he prepared an amended report. We disagree.

 The continuing treatment doctrine[2] applies in situations where a patient's injury occurs during a course of treatment for a particular condition, and the only readily ascertainable date is the last day of treatment. *Kimball v. Brothers*, 741 S.W.2d 370, 372 (Tex.1987). The *Kimball* rule does not apply to this case. There is a course of treatment causing injuries, but the date of the negligent misdiagnosis is readily ascertainable. Furthermore, treatments were rendered only on the basis of the February 1986 diagnosis, not the July 1986 follow-up report. Consequently, the continuing treatment doctrine

does not apply, and limitations began on the date of the misdiagnosis in February 1986 and expired in February 1988. Gifford's notice letter sent pursuant to Tex. Rev.Civ.Stat.Ann. art. 4590i (Vernon 1976 & Supp.1992) in April 1988 was not timely and did not extend the filing deadline. *Shook v. Herman*, 759 S.W.2d 743, 746 (Tex.App.–Dallas 1988, writ denied). As noted earlier, Gifford filed suit against Molina in July 1988, well outside the limitations period. Thus, his claim is barred unless the jury's finding of fraudulent concealment is sustainable.

In point two, Dougherty and Molina contend that the jury finding of fraudulent concealment is not supported by legally or factually sufficient evidence.

 It is undisputed that Gifford learned of the misdiagnosis in May 1986, within the limitations period. Gifford asserts that suit was not filed earlier because Molina's identity as the pathologist who did the work was concealed until after limitations had run. To succeed on this fraudulent concealment claim, Gifford had to show that Dougherty and Molina had actual knowledge of Molina's involvement, a duty to disclose Molina's identity, and a fixed purpose to conceal Molina's identity. *See Rhodes v. McCarron*, 763 S.W.2d 518, 524 (Tex.App.–Amarillo 1988, writ denied); *Leeds v. Cooley*, 702 S.W.2d 213, 215 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). If fraudulent concealment is established, Molina is estopped from claiming limitations as an affirmative defense. *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983).

Dougherty assigned Molina to do Gifford's pathology work. Molina prepared his report on Dougherty's business forms. Dougherty billed Gifford for Molina's work. Knowledge of Molina's involvement is indisputably shown.

---

1. Tex.Rev.Civ.Stat.Ann. art. 4590i, § 10.01 (Vernon Supp.1992).

2. Tex.Rev.Civ.Stat.Ann. art. 4590i, § 10.01 (Vernon Supp.1992) provides:
 Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed; ....

Fraudulent concealment may be shown where a party affirmatively conceals the responsible party's identity, *Cherry v. Victoria Equipment & Supply, Inc.*, 645 S.W.2d 781, 782 (Tex.1983), if there is a duty to disclose one's identity. In *Cherry*, a potential defendant repeatedly disavowed, when deposed, any involvement in the occurrence in question. The court reasoned that such testimony, being under oath, could support a finding of fraudulent concealment. *Cherry v. Victoria Equipment & Supply, Inc.*, 645 S.W.2d at 782. We see *Cherry* as standing for the principle that the nature of the parties' relationship controls the duty of disclosure. Thus, a party responding under oath is under a higher duty to disclose than someone in a negotiation process. Likewise, a higher duty to disclose exists in a physician/patient relationship.[3] Consequently, Dougherty and Molina's duty to disclose depends on their relationship with Gifford. For the reasons discussed below, we find that Dougherty and Molina had a duty to disclose Molina's identity because a physician/patient relationship existed between each of them and Gifford.

Dougherty and Molina assert that the evidence does not show a physician/patient relationship between either of them and Gifford. Relying on *Childs v. Weis*, 440 S.W.2d 104 (Tex.Civ.App.–Dallas 1969, no writ), and *Lotspeich v. Chance Vought Aircraft*, 369 S.W.2d 705 (Tex.Civ.App.–Dallas 1963, writ ref'd n.r.e.), they argue that because Gifford's pathology work was done exclusively for other doctors, the pathologist did not see Gifford, and Gifford did not personally select Molina or Dougherty, there was no physician/patient relationship. Their reliance is misplaced.

*Lotspeich* involved a woman who was sent to a company doctor for a pre-employment physical. That court did not reach the question of whether the physician owed a duty to disclose because they found that

no duty to even discover the presence of the disease existed. *Lotspeich v. Chance Vought Aircraft*, 369 S.W.2d at 710. The doctor's sole duty was owed to the company which employed him because the examination was only for the company's benefit. *Id.* at 710. The services in our case were for Gifford's benefit.

*Childs* involved a malpractice action where a woman went to an emergency room when she began having premature labor pains. The nurse called the doctor on duty, who merely advised the woman to call her regular doctor. The court found that there was not a physician/patient relationship because the doctor was under no duty to examine or treat Mrs. Childs. The telephone conversation with a nurse did not amount to an acceptance of the case, and the instructions could not be construed as treatment. *Childs v. Weis*, 440 S.W.2d at 106–07. Thus, the doctor rendered no services at all. That is not the case here.

We also note that the Medical Liability and Insurance Improvement Act does not predicate liability for health care related claims on physical contact. Under the statute, "health care" encompasses any treatment performed or furnished on Gifford's behalf. TEX.REV.CIV.STAT.ANN. art. 4590i, § 1.03(a)(2) (Vernon Supp.1992).[4] There is no doubt the diagnostic services were furnished on Gifford's behalf.

We conclude that Dougherty and Molina created a physician/patient relationship with Gifford by accepting the pathology work, conducting the laboratory analysis, preparing the pathology report, and billing Gifford. In such circumstances, there is at least an implied agreement between the parties.

Although we find no Texas case addressing the issue of whether a physician/patient relationship exists between a pathologist and a person never physically contact-

---

3. The *Cherry* duty to respond truthfully seems less onerous than the physician's duty to come forward and disclose negligence or the occurrence of an injury to a patient. *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex.1983).

4. The full text is: "'Health care' means any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement."

ed, at least two other jurisdictions have considered the issue. In *Walters v. Rinker*, 520 N.E.2d 468 (Ind.Ct.App.1988), the court found that a consensual physician/patient relationship existed between the pathologist and the patient. That court reasoned,

[A] consensual relationship between a physician and a patient may exist where others have contracted with the physician on the patient's behalf. ...

... The important fact in determining whether the relationship is a consensual one ... is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit. ... Where ... healthcare services are rendered on behalf of the patient and are done for the patient's benefit, a consensual physician-patient relationship exists for the purposes of medical malpractice.

*Walters v. Rinker*, 520 N.E.2d at 472.

In *Peterson v. St. Cloud Hospital*, 460 N.W.2d 635 (Minn.Ct.App.1990), the court held as a matter of law that a consensual physician/patient relationship existed between a pathologist and the patient. That case is factually similar to this case. A patient was erroneously diagnosed as having cancer requiring chemotherapy and radiation treatments. Treatments were administered, although there was no cancer. That court dismissed an argument that the lack of direct contact with a patient precluded a physician/patient relationship. *Id.* at 638. The court, like the *Walters* court, found that a physician/patient relationship existed because of the consensual nature of the relationship. It was clear to that court that the pathologist contracted with the examining physician with either the express or implied consent of the patient for the patient's benefit. This established the physician/patient relationship as a matter of law. *Id.* at 638.

In this case, Dougherty contracted with the hospital to perform pathology services. Gifford's physician sent the biopsy to the hospital, knowing that Dougherty performed all its pathology work. Dougherty had Gifford's implied consent, at least, to perform or furnish these services. Dougherty then assigned Gifford's pathology work to Molina pursuant to an arrangement between Molina and Dougherty. Molina performed the services for Gifford's benefit and with implied consent. We find that a physician/patient relationship existed between both Dougherty and Molina as a matter of law.

Molina and Dougherty argue that, even if a physician/patient relationship did exist, it existed only on February 21, 1986, the date of the original biopsy, with the duty to disclose Molina's identity expiring on that day. That argument is illogical, because on that date neither Molina nor Dougherty knew that the misdiagnosis had occurred. They learned of the misdiagnosis at the same time that Gifford did, in late May of 1986. Regardless, the duty was breached even if it existed only on that day because Molina's identity was not disclosed to Gifford at that time.

 Another element of fraudulent concealment is a fixed purpose to conceal. *Rhodes v. McCarron*, 763 S.W.2d 518. There is certainly some evidence of a purpose to conceal Molina's involvement. Dougherty and Molina rely on the fact that there is no evidence of affirmative acts of concealment, and on Gifford's physicians' testimony that they did not know of any acts of concealment. However, silence in the face of a duty to disclose may be an act of concealment. *See, e.g., Borderlon v. Peck*, 661 S.W.2d at 908. Gifford's only contact with the pathologist was the bills he received from Dougherty & Associates. The bills did not name Molina. Indeed, the bill has a code to indicate when the lab work has been done by an independent, but no such information was shown. The bills were written on Dougherty's stationery, and even Dougherty acknowledged that reasonable persons could believe that such a bill would indicate the person who actually did the work. The most damaging evidence is the addendum report, prepared after the initial error in diagnosis was discovered, which Dougherty testified was prepared in order to "clean it up." Molina's involvement was still not disclosed.

Finally, Dougherty did not disclose that Molina was involved even after he received an Article 4590i notice letter. While none of this evidence shows overt acts of concealment, it is legally and factually sufficient for a jury to conclude that there were continuing efforts to mislead or prevent the discovery of information which would reveal Molina's involvement. *See Texas Harvester Co. v. Wilson–Whaley Co.*, 210 S.W. 574 (Tex.Civ.App.–Fort Worth 1918, writ ref'd).

■■■ Molina asserts that he must have personally performed an act of concealment. It is true that the acts of third parties will not usually support fraudulent concealment. *Cato v. South Atlantic & Gulf Coast District of the International Longshoreman's Ass'n*, 364 F.Supp. 489 (S.D.Tex.), 485 F.2d 583 (5th Cir.1973). In light of our holding that Molina had a duty to disclose his identity and involvement, however, his silence is a participating act on which fraudulent concealment may rest. We find it unnecessary to discuss the question whether Dougherty's alleged acts of concealment may be imputable to Molina as a co-defendant.

■■■ Another question is whether Gifford's reliance was reasonable. In other words, would the discovery of the misdiagnosis cause a reasonably prudent person to make inquiry leading to discovery of Molina's identity. *See Evans v. Conlee*, 741 S.W.2d 504, 506 (Tex.App.–Corpus Christi 1987, no writ).

Dougherty and Molina emphasize Gifford's physicians' testimony and the pathology report that bore Molina's illegible signature and initials. The physicians testified that they knew of and would have disclosed Molina's role if they had been asked. Dr. Cochran testified at one point that he told Gifford who made the diagnosis. Gifford sent Molina an Article 4590i notice letter on April 27, 1988, beyond limitations, but over two months before Molina was added to the suit.

On the other hand, there was evidence that the pathology report and bills were prepared and sent under Dougherty & Associates' name. Dougherty failed to tell Gifford of Molina's involvement even after Dougherty received an Article 4590i notice letter in September 1987. Dougherty admitted that the nature of the bills could lead to the belief that the physician named on the bills, i.e., Dougherty, was the one performing the services. Dr. Williams testified that she did not normally disclose the identity of the pathologist to her patients and did not do so with Gifford. We conclude that there was legally and factually sufficient evidence of reasonable reliance on the part of Gifford.

The trial court did not err on the statute of limitations issue because the jury finding of fraudulent concealment is supported by legally and factually sufficient evidence.

In point of error five, Dougherty contends that Gifford's claims against Dougherty & Associates, the professional association, were barred by limitations. Dougherty's position is that, since he was originally sued as M.K. Dougherty d/b/a Marshall K. Dougherty, M.D. and Associates, he was sued as an individual and limitations barred Gifford's subsequent claims that the corporation, M.K. Dougherty & Associates, P.A., was vicariously liable for Molina's misdiagnosis. He asserts that the pleadings misled and prejudiced him, and that by failing to secure a jury finding on lack of prejudice, Gifford waived any defense against limitations.

■■■ If Gifford merely misnamed Dougherty in his original petition, limitations was tolled and Gifford's subsequent amendment related back to the date of the original petition. *Enserch Corp. v. Parker*, 794 S.W.2d 2 (Tex.1990). If, however, Gifford was mistaken about whom to sue, i.e., he misidentified the defendant, limitations is not tolled. *Id.* at 5. Misidentification often arises where there are two distinct corporations having same or similar names. *See, e.g., Enserch Corp. v. Parker*, 794 S.W.2d 2; *Continental Southern Lines, Inc. v. Hilland*, 528 S.W.2d 828 (Tex.1975); *Palmer v. Enserch Corp.*, 728 S.W.2d 431 (Tex.App.–Austin 1987, writ ref'd n.r.e.); *Howell v. Coca–Cola Bottling Co. of Lubbock*, 595 S.W.2d 208 (Tex.Civ.

App.–Amarillo), *writ ref'd n.r.e. per curiam,* 599 S.W.2d 801 (Tex.1980). In the present case, there was no evidence of distinctly separate entities bearing similar names. The error here was misnomer rather than misidentification.

■■■■ The primary purpose of limitations is to force the plaintiff to file suit within a reasonable time so that the defendant has a fair opportunity to gather competent and reliable evidence. *Continental Southern Lines, Inc. v. Hilland,* 528 S.W.2d at 831. The statute should not apply in circumstances where no party is misled or disadvantaged by the error in pleading. *Palmer v. Enserch Corp.,* 728 S.W.2d at 434; *see also Barnett v. Houston Natural Gas Co.,* 617 S.W.2d 305, 306 (Tex.Civ.App.–El Paso 1981, writ ref'd n.r.e.). Even in cases of misidentification, limitations does not bar suits where the proper defendant was not prejudiced by the mistake. *See Continental Southern Lines, Inc. v. Hilland,* 528 S.W.2d at 831. One reason why the statute is tolled in cases of misnomer is that the party intended to be sued has been served and put on notice that he is the intended defendant. *Braselton–Watson Builders, Inc. v. Burgess,* 567 S.W.2d 24, 28 (Tex.Civ.App.–Corpus Christi 1978, writ ref'd n.r.e.).

Since Gifford did not allege or obtain findings on the prejudicial effect of his failure to correctly name Dougherty in the original petition, the question is whether the evidence conclusively proved that Dougherty was not misled or prejudiced by the amendment. *See Wright v. Gifford–Hill & Co.,* 736 S.W.2d 828 (Tex.App.–Waco 1987, writ ref'd n.r.e.).

■■■ It is difficult to conclude that Dougherty could have been misled or prejudiced by the mere fact that his association was not sued as a professional corporation. The corporation was wholly owned, directed and operated by Dougherty. Service was effected upon him. The same attorney represented Dougherty throughout the litigation. Dougherty received a 4590i notice letter addressed to M.K. Dougherty, M.D. & Associates in August 1987, well before the suit was filed. There is only one entity known as M.K. Dougherty, M.D. & Associates. That entity was involved in the transaction or occurrence forming the basis of Gifford's claims. Dougherty's verified denial contesting the capacity in which he was sued also implies that he knew that the association was the real defendant in the case.[5]

■■■ Dougherty also asserts that he was misled because the cause of action in the amendment is different from that in the original petition. The test for determining whether limitations bars a cause of action added in an amended petition is whether the amended cause of action is wholly based on or grows out of a new, distinct, or different transaction or occurrence. *Leonard v. Texaco, Inc.,* 422 S.W.2d 160, 163 (Tex.1967); *Meisler v. Republic of Texas Savings Ass'n,* 758 S.W.2d 878 (Tex.App.–Houston [14th Dist.] 1988, no writ); *Stone v. Brown,* 621 S.W.2d 182, 184 (Tex.Civ.App.–Texarkana 1981, writ ref'd n.r.e.).

In his amended pleading, Gifford added only claims related to the *ground of liability,* i.e., *vicarious liability,* arising from the pathology work on Gifford's biopsy. The same occurrence or transaction, the pathology services, gave rise to both the original and the amended claims. We hold that Dougherty was not misled or prejudiced by the later amendment and that the suit against him was not barred by limitations.

In points six and seven, Dougherty complains that the trial court should have granted a new trial because the evidence was legally and factually insufficient to support the jury's findings that Molina was an employee and borrowed servant of Dougherty.

■■■ We will consider the employer/employee and borrowed servant issues together, because Molina can be a borrowed servant only if the same elements exist that

---

**5.** The trial court in this case seemed to recognize that this business was Dougherty's alter ego. However, the court made no specific findings in this regard.

would make him an employee if he were not already employed by another. *United States Fidelity & Guaranty Co. v. Goodson,* 568 S.W.2d 443, 447 (Tex.Civ.App.–Texarkana 1978, writ ref'd n.r.e.). The right of control is the key in determining whether Molina was an employee. *Newspapers, Inc. v. Love,* 380 S.W.2d 582, 590 (Tex.1964). The relevant factors to consider in determining whether one is an independent contractor rather than an employee are (1) whether the nature of his business is independent from that of the "employer"; (2) who furnishes the tools, supplies, and materials; (3) who has control of the details of the work to the final results; (4) the length and regularity of employment; and (5) whether compensation is by the time or by the job. *Pitchfork Land and Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598, 603 (1961).

■ For an employer/employee relationship to exist, the right of control must extend to the means and details of accomplishment, as well as the end result. *Thompson v. Travelers Indemnity Co. of Rhode Island,* 789 S.W.2d 277 (Tex.1990). An employer will normally control "when and where to begin work, the regularity of hours and the amount of time spent on particular aspects of work, the physical method or manner of accomplishing an end result, and control of the type of tools and appliances used to perform the work." *Thompson v. Travelers Indemnity Co. of Rhode Island,* 789 S.W.2d at 278–79; *United States Fidelity & Guaranty Co. v. Goodson,* 568 S.W.2d at 447. It is the existence, rather than the exercise, of the right to control that determines the nature of the relationship. *Newspapers, Inc. v. Love,* 380 S.W.2d at 590. The nature of the work involved may not require much control or supervision. *Keith v. Blanscett,* 450 S.W.2d 124 (Tex.Civ.App.–El Paso 1969, no writ).

■ Unless the evidence is conclusive and reasonably susceptible to only one inference, the question whether a person is an employee or an independent contractor is one of fact. *Pitchfork Land and Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598;

*Halliburton v. Texas Indemnity Ins. Co.,* 147 Tex. 133, 213 S.W.2d 677 (1948); *El Paso Laundry Co. v. Gonzales,* 36 S.W.2d 793 (Tex.Civ.App.–El Paso 1931, writ dism'd). The evidence here is conflicting and susceptible to different inferences.

■ Gifford presented evidence that Molina was an employee of Dougherty. The two had an arrangement where Molina would perform work for Dougherty at Dougherty's request. The arrangement continued on a fairly regular basis. Molina did his work in a hospital laboratory, in which only someone working with or for Dougherty was allowed to do pathology work. Compensation was on a per diem basis rather than on a quantitative basis. Molina could not bill independently for his services. Bills for, and reports of, Molina's work bore Dougherty's association's name, and Molina signed the report just above the association's name without indicating that he was an independent contractor. Gifford's treating physician testified that doctors operating independently would not sign reports in that manner. Dougherty assigned the work to be done by Molina, and Molina's reports were generated just as any work performed by Dougherty. There was testimony implying that Dougherty controlled, with input from Molina, which work would be done, who would do it, and where it would be done. At one point, Molina testified that Dougherty "was the boss." The work was exactly the same type of work Dougherty would do, unlike that generally done by a subcontractor for a general contractor. When asked about a similar hypothetical arrangement, Dr. Phillips testified that it would appear to be an employee-type relationship. Dougherty conceded that the relationship might appear to some persons to be that of an employer/employee. Molina testified that control of the work details was not necessary because of the professional nature of the work, but he agreed that a professional could be an employee.

Dougherty contends that the flat per diem rate of pay, lack of a set schedule for work, failure to withhold income or social security taxes, and the lack of control over

the number of hours Molina was required to work weighs against an employer/employee relationship. Pay on a daily basis is indicative of an *employee relationship*, as it is not based on amount of output or job completion. There is no evidence at all regarding whether income or social security taxes were withheld from Molina's pay. While there was no set schedule, Molina regularly came to Paris to work for Dougherty.

As to lack of control over the number of hours to work, there was testimony that Dougherty made the assignments and Molina was free to reject them. However, Molina only came to Paris at Dougherty's request. It is a reasonable inference from this testimony that Molina was merely free to terminate his relationship in the same manner as an employee.

Dougherty further argues that Molina was an employee of Masterpath, an independent business that had no obligation to work for Dougherty. The independence element goes to the nature of the work, not the nature of the entities. *See Pitchfork Land and Cattle Co. v. King*, 162 Tex. 331, 346 S.W.2d 598. The work Molina performed was clearly the same type of work Dougherty regularly engaged in. This evidence shows that Molina/Masterpath could be an independent business, yet still be an employee of Dougherty in Paris. *See Clark v. Texaco, Inc.*, 382 S.W.2d 953 (Tex.Civ.App.–Dallas 1964, writ ref'd n.r.e.).

Dougherty argues that the "tools" of a pathologist are his knowledge and ability, and any physical tools, such as the laboratory, were provided by the hospital instead of Dougherty. Dougherty, however, had the pathology contracts and was director of the hospital laboratory. Since this was where Molina performed his analysis, Dougherty effectively provided the physical tools Molina used.

Finally, Dougherty claims that any limited supervision or control he may have been able to exercise was not sufficient to negate Molina's independent contractor status. Dougherty dismisses the billing procedure as having nothing to do with control

and does not address the pathology report prepared and signed by Molina on Dougherty's forms. Molina testified that, because of the professional nature of his work, very little supervision was necessary. However, it is the right of control and not the exercise thereof that is determinative.. The pathology report, signed by Molina above Dougherty's name, and Molina's testimony that Dougherty "was the boss," present strong evidence of control. Molina also testified that when he was working for Masterpath, he used his own stationery.

On the borrowed servant issue, the evidence showed that Molina was an employee of Masterpath, which Molina owed entirely. Dougherty made payment to Masterpath rather than directly to Molina. This seems to show that Molina was employed by Masterpath at the time he rendered services to Dougherty. Thus, the evidence supports the finding of a borrowed-servant relationship.

█ The evidence certainly does not present a case of uncontradicted testimony or overwhelming evidence, *Cochran v. Wool Growers Central Storage Co.*, 140 Tex. 184, 166 S.W.2d 904, 908 (1942); *Broady v. Johnson*, 763 S.W.2d 832, 834 (Tex. App.–Texarkana 1988, no writ), from which only one reasonable conclusion could be reached. *Pitchfork Land and Cattle Co. v. King*, 346 S.W.2d at 603. In that situation, it is the right of the jury to weigh the evidence. *Royal Globe Ins. Co. v. Suson*, 626 S.W.2d 161, 163 (Tex.App.–Fort Worth 1981, writ ref'd n.r.e.). An appellate court should overturn a jury's findings only if they are against the great weight and preponderance of the evidence. *Cain v. Bain*, 709 S.W.2d 175 (Tex.1986). We find that the jury's answers to the employee and borrowed servant questions are supported by legally sufficient evidence and not against the great weight and preponderance of the evidence.

In view of our disposition of the employer/employee and borrowed servant issues, it is not necessary that we consider the ostensible agency and estoppel issues, since the judgment can be supported without them.

Dougherty also contends that the trial court committed harmful error by allowing an improperly designated expert, Dr. Norton, to testify on the issue of future damages. Dougherty asserts that without this testimony there was no evidence of any future damages.

■ Although not initially designated as an expert, Dr. Norton was named in Gifford's supplemental answers as a person having knowledge of damage to Gifford. These supplemental answers were filed September 7, 1990, more than thirty days before trial on October 9, 1990. Gifford's answers to these interrogatories were perhaps not as precise as they could have been, but Dougherty's interrogatories themselves were lacking in clarity. They never asked specifically for the names of testifying experts or the subjects of testimony, asking instead for the names of nonconsulting experts and the "services or purposes" for which each expert was employed. In the same supplemental response where Norton was listed as a person having knowledge of future damage, Gifford stated that Dr. Norton was retained to "determine whether the Defendant's conduct was negligent."

Dougherty argues that this designation was insufficient because Dr. Norton had barely mentioned damages in her affidavit and not at all in her deposition. Dr. Norton's affidavit in its last sentence states, "This misdiagnosis led to unnecessary, harmful chemotherapy and irradiation to the patient." Norton was not questioned on this statement. The closest Dougherty came to this subject was his question, "Anything else that you're going to discuss with the jury." After Gifford objected that the witness could not anticipate questions, Norton answered in the negative. Not only should Gifford's objection itself have prompted a more pointed question, but, in context, this question does not really ask about any and all opinions not already covered. The question follows another "anything else" question pertaining to the biopsy slides, and precedes questions about other materials reviewed and questions about standard of care.

Dougherty's attorney was using this affidavit as a reference in questioning Norton. He questioned Norton on most of the statements in the affidavit except this one. Under these circumstances, Dougherty cannot complain about the designation or testimony of Norton.

■ As to future medical care, Dougherty contends there must be testimony from doctors as to dollar figures or other evidence that future medical care will be necessary, and there was none here. As this Court has stated,

> The award of future medical expenses is a matter primarily for the jury to determine. *Precise evidence is not required.* The jury may make its award based upon the nature and course of the injuries or disability, the medical care rendered before trial, past medical expenses, and the condition of the injured party at the time of trial. The plaintiff is not required to establish the future medical consequences of his injury by expert medical testimony grounded only on reasonable medical probability.

*Gladewater Municipal Hospital v. Daniel,* 694 S.W.2d 619, 621 (Tex.App.–Texarkana 1985, no writ) (emphasis added).

■ Dougherty argues that there was no evidence that the past medical expenses were necessary and reasonable, and an award including these amounts is impermissibly speculative. *See Roth v. Law,* 579 S.W.2d 949, 956 (Tex.Civ.App.–Corpus Christi 1979, writ ref'd n.r.e.). Dougherty and Molina made no objection to the evidence of past medical expenses on this or any other ground. Indeed, their counsel expressly stated that he had no objection to such evidence. Any error in this respect was waived.

We hold that Norton's testimony was properly admitted, and no error is shown with respect to the jury's award of past medical as well as future damages.

In their eleventh point of error, Dougherty and Molina complain that the awards of $1,000,000.00 to Mr. Gifford and $200,-000.00 to Mrs. Gifford were excessive and

not supported by factually sufficient evidence.

■ The standard of review for remittitur is factual sufficiency, and all of the evidence must be reviewed. *Snoke v. Republic Underwriters Ins. Co.*, 770 S.W.2d 777 (Tex.1989); *Larson v. Cactus Utility Co.*, 730 S.W.2d 640 (Tex.1987); *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). The standard requiring review of favorable evidence only, as expressed in *Armellini Express Lines of Florida, Inc. v. Ansley*, 605 S.W.2d 297, 310 (Tex.Civ.App.–Corpus Christi 1980, writ ref'd n.r.e.), was expressly disapproved in *Pope v. Moore*, 711 S.W.2d at 624.

Dougherty analogizes the present case to *Louisiana & Arkansas Railway Co. v. Capps*, 766 S.W.2d 291 (Tex.App.–Texarkana 1989, writ denied), where this Court ordered a remittitur. In that case, a knee injury ended a railroad worker's career, caused continuing pain and depression, and interfered with his prior recreational and home activities. This Court noted the lack of evidence going to total inability to work, mobility impairment, life-threatening injury, and normal mental and physical functions. The present case also lacks evidence on some of those factors, i.e., inability to work and mobility impairment. However, there is evidence of adverse psychological effects, for which Gifford received medication and counseling. When Dr. Norton's testimony is considered, there is evidence as to the life-threatening nature of the injury because of the risk of future cancer.

■ The physical and psychological effects of Gifford's ordeal differ from those arising in most personal injury cases. Gifford was informed that this particular cancer had a fifteen percent survival rate and that he had two days to get his affairs in order. The treatments lasted weeks, while most injuries occur instantly. The effects of the treatment, such as nausea and weight loss, continued throughout the treatment period. This evidence shows that the pain, suffering and mental anguish associated with the injury itself was not the result of a sudden event, but rather slowly inflicted. Nevertheless, we con-

clude that the evidence is factually insufficient to support an award to Gifford of $1,000,000.00. There is no claim or proof of future lost wages, loss of earning capacity, or extensive future medical costs. As in *Louisiana & Arkansas Railway Co. v. Capps*, 766 S.W.2d 291, there is no suggestion that Gifford will be unable to work, that his physical ability to do many of the ordinary tasks of life has been substantially impaired, or that he will be unable to engage in many activities which are considered part of a normal life style. While we do not disparage the severity of his emotional injuries, we find the evidence insufficient to justify an award of $1,000,000.00 in the circumstances of this case. Consequently, we will suggest a remittitur of $300,000.00.

■ Dougherty also complains that the $200,000.00 award to Mrs. Dougherty was not supported by the evidence. He first contends there is no evidence as to the loss of household services. The term "household services" generally relates to domestic duties. *EDCO Production, Inc. v. Hernandez*, 794 S.W.2d 69, 77 (Tex. App.–San Antonio 1990, writ denied); *see also Whittlesey v. Miller*, 572 S.W.2d 665, 666 n. 2 (Tex.1978). There is evidence that Mr. Gifford is no longer active around the house, that he no longer handles the couple's financial matters, and that he is irritable and depressed. Through evidence that the couple's twenty-eight-year-old handicapped son lives at home and is totally dependent on the couple for his support, a jury could infer that some out-of-the-ordinary duties were required. We find ample evidence to support an award for loss of household services.

■ Dougherty also complains that there is no evidence linking loss of consortium damages to the chemotherapy and irradiation treatments. Loss of consortium includes loss of affection, solace, companionship, society, assistance and sexual relations necessary to a successful marriage. *Whittlesey v. Miller*, 572 S.W.2d at 666. Mrs. Gifford testified to their long and happy marriage before the treatments. They both testified as to the state of their

relationship afterwards, including loss of sexual relations and the fact that they now undergo marriage counseling. Mr. Gifford testified that close friends do not come around anymore. Mrs. Gifford testified that she no longer enjoyed being around her husband.

We hold the evidence sufficient to support an award for loss of consortium.

■■■■ The jury may exercise considerable discretion and generosity in awarding damages for personal injuries, *EDCO Production, Inc. v. Hernandez*, 794 S.W.2d at 77; *Loyd Electric Co. v. Millett*, 767 S.W.2d 476, 484 (Tex.App.–San Antonio 1989, no writ); *Firestone Tire & Rubber Co. v. Battle*, 745 S.W.2d 909, 917 (Tex.App.–Houston [1st Dist.] 1988, writ denied). The jury appears to have made a conscious and deliberate attempt to compensate Mrs. Gifford for her loss. *See EDCO Production, Inc. v. Hernandez*, 794 S.W.2d at 77. The evidence is factually sufficient to support the award to Mrs. Gifford.

If, within fifteen days from the date of this opinion, Gifford remits the sum of $300,000.00, the judgment will be affirmed; otherwise, the judgment will be reversed and remanded.

GRANT, Judge, partially dissenting.

I dissent only from that portion of the opinion ordering a remittitur.

The jury heard evidence about how Russell Gifford was told that he had two days to get his affairs in order; that his esophageal cancer was so serious that there was not time for a second opinion, and that he must immediately begin radiation and chemotherapy treatments; about the emotional trauma he suffered when he told his father and his four children; about how he turned his hardware store over to his oldest son; and about how he wondered if he would get to see another Christmas with his children.

Texas law recognizes a right to recover damages for pain and anguish suffered in the anticipation of death. Under Texas law, a person's knowledge of his impending death and its effect on his family are to be considered in determining the amount to be awarded as compensation for mental anguish. *Tarrant County Hospital District v. Jones*, 664 S.W.2d 191 (Tex.App.–Fort Worth 1984, no writ). Even when the consciousness of impending death is only momentary, it is a proper element to be considered in evaluating mental suffering. *See Green v. Hale*, 590 S.W.2d 231 (Tex.Civ.App.–Tyler 1979, no writ). Russell Gifford should be entitled to recover for those same damages because he was led to believe and did believe for over three months that he was staring death in the face.

The jury heard evidence about how Russell Gifford endured the agony of chemotherapy and 3,000 rads of radiation therapy, how this treatment kept him weak (had to use a wheelchair) and nauseated (resulting in his loss of thirty-five pounds during the three-month period), and how he had then faced massive surgery in which his esophagus was going to be removed and replaced by a part of his intestines.

The jury also heard about the after-effects of radiation and chemotherapy; about how it had resulted in a deep depression, eliminated his sex life, and affected his relationship with all those around him; about how this deep depression has gone on for four-and-a-half years, requiring psychological help; and about how the physicians had told him that the long-term effects of chemotherapy and radiation on an otherwise healthy individual were unknown.

The jury award to Russell Gifford was for physical pain, mental anguish, physical impairment, and medical care. The majority opinion directs a remittitur on the basis that Gifford offered no "proof of future lost wages, loss of earning capacity, or extensive future medical costs." Gifford did not seek compensation on those bases. "Physical impairment" is not always the equivalent of a "diminished capacity to work and earn money." *French v. Grigsby*, 567 S.W.2d 604 (Tex.Civ.App.–Beaumont), *writ ref'd n.r.e. per curiam*, 571 S.W.2d 867 (Tex.1978). Russell Gifford's damages should not be viewed only in a

light of economic loss, because his losses were more than economic.

No court is free to substitute its judgment for that of the jury as to damages which should be awarded for mental anguish. *Brown v. Robinson,* 747 S.W.2d 24 (Tex.App.–El Paso 1988, no writ). The amount of damages to be awarded for pain and suffering must be left to the sound discretion of the trier of fact. *Carrell v. Richie,* 697 S.W.2d 43 (Tex.App.–Austin 1985, writ ref'd n.r.e.). This is especially true in regard to claims for pain, suffering, and mental anguish, which are areas necessarily speculative, that compensatory damages should be left to the determination of the jury, as the jury judges the credibility of the witnesses and the weight to be given their testimony. *Kneip v. UnitedBank–Victoria,* 774 S.W.2d 757 (Tex.App.–Corpus Christi 1989, no writ).

I cannot agree with the appellant's contentions that the damages awarded by the jury were grossly excessive and not supported by factually sufficient evidence. The jury was justified in awarding a significant amount for the tragic ordeal that this man suffered and continues to suffer.