# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-17-00534-CV

**Denise Stroup, as Legal Guardian of D. L. S., an Incapacitated Person, Appellant**

**v.**

**MRM Management, Inc., Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-17-003290, HONORABLE KARIN CRUMP, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This is an appeal from a take-nothing summary judgment rendered by the district court of Travis County in a personal injury suit. Appellant is Sandra Denise Stroup (Stroup), Guardian for her brother Douglas Lee Stroup, and appellee is MRM Management, Inc. (MRM).[1] The issue concerns the vicarious liability *vel non* of MRM for the negligent acts of Penny Harrington Taylor.

Taylor and Douglas Lee Stroup were involved in an automobile-motorcycle crash on east Oltorf Street in Austin in August 2015. Immediately before the collision, Taylor drove her car from the driveway of La Quinta Inn onto eastbound Oltorf attempting to turn left onto westbound Oltorf. At that time, Douglas Stroup was operating his motorcycle east on the inside lane of Oltorf. The motorcycle struck the driver's side of Taylor's car. Stroup sued Taylor asserting that Taylor's negligence proximately caused her brother to suffer severe personal injuries.

---

[1] Keller Williams Realty is the trade name for MRM.

Stroup pleaded further that Taylor was a licensed real-estate salesperson associated with MRM and that at the time of the collision, Taylor was engaged in real-estate sales activities. Stroup claimed that MRM was vicariously liable for Taylor's tortious conduct pursuant to principles of (1) respondeat superior; (2) principal-agent liability; (3) joint enterprise; and (4) by operation of law pursuant to the Texas Occupations Code.

Before the collision, Taylor had listed for sale a house located on Crest Avenue, which was owned by her husband. To make the house more attractive, she planned to do some landscaping. She engaged her friend Lynn Crossett, a landscape contractor, to do the work. At the time, she and Crossett were carrying on an affair. On the morning of the collision, she and Crossett breakfasted together and then went to Home Depot where she bought supplies for the job. They then took a room at La Quinta Inn on Oltorf. She paid for the room with her credit card. Taylor testified on deposition that Crossett needed to stay at the motel for several nights to do the Crest Avenue job and other work located nearby.

At some point, Taylor decided to move her car to a shaded area. At that time, she noticed that the car was dusty and decided to drive to a car wash. As she pulled onto Oltorf, the collision occurred.

After discovery, MRM filed a traditional and no-evidence motion for summary judgment, maintaining that it was not vicariously liable for Taylor's conduct because at all times relevant, Taylor was acting as an independent contractor. After hearing, the district court rendered a take-nothing summary judgment.[2]

---

[2] After the district court rendered summary judgment, Stroup settled with Taylor.

If there is no contract between the parties constituting one of them as an independent contractor, the courts recognize several factors to aid in making that determination, namely, (1) the independent nature of the business; (2) his obligation to furnish necessary tools, supplies and materials to perform the job; (3) his right to control the progress of the work except as to final results; (4) the time for which he is employed; and (5) the method of payment whether by the time or the job. *Pitchfork Land & Cattle Co. v. King*, 346 S.W.2d 598, 603 (Tex. 1961). Right of control is the most important of these factors in determining whether a master-servant relationship rather than an independent-contractor relationship exists. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 542 (Tex. 2002).

A contract expressly providing that a person is an independent contractor is, however, determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties. *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 588–90, 592 (Tex. 1964); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 713 (Tex. App.—Fort Worth 2006, no pet.).

Stroup does not contend, nor does the summary-judgment record show, that the contract between the parties was modified or changed by a subsequent agreement between the parties. *See Newspapers*, 380 S.W.2d at 584.

Taylor's status as an independent contractor is expressly established by the terms of the parties' contract. The contract is entitled "Independent Contractor Agreement." The first paragraph

3

provides that the "Licensee [sic]" MRM "engages Agent [Taylor] as an independent contractor to assist clients of the Market Center [MRM] with the purchase and sale of real estate." Paragraph 2A allows that Agent (Taylor) understands that she is entering into the Agreement as an independent contractor and not as an employee. Paragraph 2A states further that "Agent's [Taylor's] independent contractor status will define the parties' relationship despite any contrary designation that appears in Agent's [Taylor's] real estate license."

Other summary-judgment proof confirms her status as an independent contractor. She worked as much or as little as she wanted. In the eight years before the collision, she handled only a few completed sales. She received payment only when a sale of property closed. Taxes were not withheld from any commissions paid by MRM. Taylor provided her own "tools," namely, her own car, business cards, yard signs, lock boxes, and marketing materials. She paid for some, if not all, of her associate training. The contract required agents to pay for access to the MRM Intranet and email system. She also paid for her licensing and association fees.

Stroup does not rely on extrinsic summary-judgment evidence to show that the parties' contract was a sham or subterfuge. *See id.* Instead, she contends that other terms of the contract and MRM's manual of Policies and Guidelines raise fact issues as to whether the "true" contract created a master-servant relationship. In that connection Stroup emphasizes Section 4.9.1.14 of the manual of Policies and Guidelines:

4.9.1.14 **Dress Policy**
It is important that everyone who associates with and represents Keller Williams Realty do so in a professional manner. Associates *should* conduct themselves properly in public*, keep their car clean,* drive courteously and maintain a well-groomed appearance*.

> Appearance is the single most important impression factor you have. It is important to be well-groomed from a well-kept hairstyle down to ones shoes. We are professionals; our manner and appearance should reflect this at all times. This dress code should include coming into a Market Center on an associate['s] day off.

(Emphases supplied.)

Stroup regards this section as particularly relevant because Taylor's deposition testimony was that she was looking for a car wash when the collision occurred. In the briefing, Stroup claims that this section "requires" Taylor to keep her car clean, and, as such, is an example of MRM's right of control over her.

We do not agree. Jessica Tenant, an administrative employee of MRM, testified on deposition that MRM cannot tell its real estate agents how to act, what to do, and how to run their business, but MRM can "coach" them into being "more professional." To her recollection, no agent has been terminated for violation of MRM's policies and guidelines.

Section 4.9.1.14 does not "require" an agent to keep her car clean. Rather, it provides that her car "should" be clean as part of presenting a "well-groomed appearance." Appearance, we are told, is the single most important impression factor an agent has. By the section, MRM hopes to assist the agent become a more successful sales person of real estate.

Recognizing that the parties' independent-contractor agreement presents a formidable obstacle to recovery, Stroup argues that it is in conflict with the Texas Real Estate License Act, *see generally* Tex. Occ. Code §§ 1101.001–.806 ("the Act"), and therefore void. Stroup claims that Section 1101.803 creates a master-servant relationship between the supervising broker and its sales agent, as a matter of law:

5

> A licensed broker is liable to the commission, the public, and the broker's clients for any conduct engaged in under this chapter by the broker or by a sales agent associated with or acting for the broker.

*Id.* § 1101.803.

Stroup acknowledges that she has found no Texas authority supporting her argument, and we see nothing in the Act expressly or impliedly prohibiting a person sponsored by or associated with a broker from being classified as an independent contractor.

The purpose of the Act is to eliminate or reduce fraud that might be caused by unlicensed, unscrupulous, or unqualified persons or entities that engage in the real estate business. *See Henry S. Miller Co. v. Treo Enters.*, 585 S.W.2d 674, 675–76 (Tex. 1979); *Justice v. Willard*, 538 S.W.2d 651, 653 (Tex. Civ. App.—Amarillo 1976, no writ). Its purpose is not to hold brokers responsible for damages resulting from an accident caused by their sales agent when she was not engaged in the selling of real estate at the time of the accident.

Stroup argues finally that MRM failed to conclusively negate joint-enterprise liability. The elements of a joint enterprise are that the parties have (1) an express or implied agreement; (2) a common purpose; (3) a community of pecuniary interest; and (4) "an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *St. Joseph Hosp.*, 94 S.W.3d at 525–26.

MRM maintains that at least two elements of a joint enterprise are missing in its relationship with Taylor: (1) a community of pecuniary interest, and (2) an equal right to a voice in the direction of the enterprise which gives an equal right of control.

6

More than a shared business purpose is required for "a community of pecuniary interest" to exist. *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 58 S.W.3d 263, 276 (Tex. App. —Fort Worth 2001, pet. denied). The court in *Blackburn* found that the lack of evidence to "show a sharing of resources, pooling of funds, monetary investment, costs or benefits to either party" demonstrated no more than a general business interest and convenience to the parties. *Id.* at 266–67.

Here there is no summary-judgment evidence that MRM or Taylor shared resources, pooled funds, or jointly made monetary investments involving properties Taylor listed or sold through MRM. Instead, Taylor paid a portion of her commission from completed transactions to MRM in exchange for having her license sponsored by MRM and for allowing her the opportunity to take advantage of training, the office, and software programs offered by MRM to manage her real estate business.

And MRM did not have an equal voice or equal right to control the manner in which Taylor managed her listings or sold properties. As discussed previously, Taylor was not contractually bound to keep her car clean. Rather the policies and guidelines manual merely suggested that agents keep their cars clean as a part of MRM's dress policy.

The summary judgment is affirmed.

_____
Bob E. Shannon, Justice

Before Justices Puryear, Toth, and Shannon*

Affirmed

Filed: October 18, 2018

7

*  Before Bob E. Shannon, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).