

## NUMBER 13-22-00374-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

RENAISSANCE MEDICAL FOUNDATION,                                    Appellant,

v.

REBECCA LUGO, INDIVIDUALLY AND AS
NEXT FRIEND OF XXXXX XXXXX, A MINOR,                               Appellee.

**On appeal from the 139th District Court
of Hidalgo County, Texas.**

## OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Opinion by Chief Justice Contreras**

In this accelerated permissive appeal, appellant Renaissance Medical Foundation (RMF) challenges the trial court's denial of its motion for summary judgment in a personal injury suit brought by appellee Rebecca Lugo, individually and as next friend of her daughter. By one issue, RMF argues that it cannot be held vicariously liable for the

medical negligence of a physician with whom it had an employment agreement. We affirm.

## I. BACKGROUND

On or about February 9, 2018, Michael Burke, M.D., performed brain surgery on Lugo's minor daughter[1] to treat an arteriovenous malformation. According to Lugo's live petition, a "retractor placed by [Burke] migrated into [her daughter's] brainstem" during the surgery, causing "serious and permanent physical and mental injuries." The petition alleged that "[t]he retractor migrated either because": (1) "it was contacted by [Burke]," (2) "it was contacted by the suction device or its tubing used during the surgery as it was being handed to [Burke] by the surgical tech," or (3) "it was contacted by the surgical tech." Lugo alleged that Burke acted negligently by: (1) "failing [to] properly perform the surgery," (2) "failing to properly place the retractor," (3) "failing to secure the retractor," (4) "failing to monitor the location of the retractor during the surgery," and (5) "[a]llowing the retractor to migrate."[2] She argued that, as Burke's employer, RMF is vicariously liable for his negligence.[3]

RMF moved for summary judgment, arguing that it is entitled to judgment as a matter of law because "RMF cannot control—contractually and statutorily—the manner in which [Burke] provides medical care." It noted that Burke worked for RMF under an

---

[1] The suit stated that Lugo's daughter has since attained the age of eighteen but "remains mentally incompetent."

[2] The record contains a docket sheet indicating that Lugo timely filed and served a medical expert report pursuant to the Texas Medical Liability Act; that at least one defendant objected to the report; and that the trial court overruled the objection(s). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). The expert report itself does not appear in the record.

[3] Lugo also sued Doctors Hospital at Renaissance, Ltd. (DHR), the employer of the surgical technician; and Burke personally. DHR and Burke did not join in RMF's summary judgment motion and are not parties to this appeal.

employment agreement which specified that he "retain[s] the right to exercise [his] independent medical judgment in providing" medical services. It further argued that, as a nonprofit "health organization corporation," it is prohibited by statute from practicing medicine or "attempting to control the manner in which a licensed physician practices medicine." *See* TEX. BUS. ORGS. CODE ANN. § 22.056. RMF argued that "[f]or purposes of providing medical care," Burke was an independent contractor of RMF, and therefore, RMF cannot be vicariously liable for his negligence. The motion was accompanied by copies of the employment agreement and RMF's articles of incorporation, which were executed in 2005. In a response, Lugo noted that the agreement between RMF and Burke exclusively referred to Burke as RMF's employee, not an independent contractor.

The trial court denied RMF's summary judgment motion, concluding as follows:

Texas law does not preclude a Texas Nonprofit Corporation (defendant [RMF]) that is organized and intended to provide healthcare services to the public from being vicariously liable for the negligent performance of healthcare services on behalf of the Corporation. A nonprofit corporation is vicariously liable for negligent medical care performed by a licensed physician on behalf of the Corporation, when, as in this case, the Nonprofit Corporation has entered into a Physician Employment Agreement ("Agreement") with the physician that specifically obligates the physician to perform medical services to patients of the Corporation on behalf of the Corporation and that refers to the physician as an employee, even though the Agreement between the Corporation and Dr. Burke provides that he shall retain the right to exercise Physician's independent medical judgment in providing medical services to patients. The Agreement in this case provides that [RMF] had the right to exercise the requisite degree of control over the physician alleged to have committed medical malpractice sufficient to trigger vicarious liability. The suggestion that it would violate Texas law— including Texas Business Organizations Code § 22.056 and Texas Occupations Code §§ 155.003 and 164.052(a)—for [RMF] to assert control over the alleged negligent acts is not dispositive.

The trial court granted permission for RMF to file an interlocutory appeal of the order, identifying the following "controlling question of law": "Whether a Texas Nonprofit Corporation can be vicariously liable for the medical negligence of a physician employed

3

by that Corporation for the purpose of providing medical services to patients." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d); *see also* TEX. R. CIV. P. 168; TEX. R. APP. P. 28.3.

In light of the parties' agreement that a permissive interlocutory appeal is proper, and given that the application meets the statutory requirements, we accepted the appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(f); *Indus. Specialists, LLC v. Blanchard Ref. Co.*, 652 S.W.3d 11, 15 (Tex. 2022) (explaining that an appellate court may accept the appeal only if the application explains why the appeal is warranted).

## II. DISCUSSION

### A. Standard of Review

We review a trial court's denial of summary judgment de novo. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). A movant for traditional summary judgment has the burden to establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). If the movant's motion and summary judgment proof facially establish a right to judgment as a matter of law, then the burden shifts to the non-movant to raise a material fact issue. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). In this case, the parties agree that there are no disputed questions of material fact with respect to the arguments made in RMF's summary judgment motion.

### B. Applicable Law

Under the doctrine of respondeat superior, an employer is vicariously liable for the tortious acts of its employee if the employee's actions are within the course and scope of

his employment. *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998); *see Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007). On the other hand, "[b]ecause an independent contractor has sole control over the means and methods of the work to be accomplished, . . . the individual or entity that hires the independent contractor is generally not vicariously liable for the tort or negligence of that person." *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947.

"The most frequently proffered justification for imposing [vicarious] liability is that the . . . employer has the right to control the means and methods of the . . . employee's work." *Id.* Thus, "[t]he test to determine whether a worker is an employee rather than an independent contractor" is whether the entity "has the right to control the progress, details, and methods of operations of the work." *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002). An "employer controls not merely the end sought to be accomplished, but also the means and details of its accomplishment." *Id.* Moreover, "[t]o trigger vicarious liability, the right to control must extend to the specific activity from which the injury arose." *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911–12 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998)).

The right to control "may be shown by explicit contractual assignment or actual exercise of control." *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004). Whether a contract explicitly assigns the right to control is generally a question of law for the court. *Id.*

> We measure the right to control by considering: (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for

which the worker is employed; and (5) the method of payment, whether by unit of time or by the job.

*Limestone Prods.*, 71 S.W.3d at 312 (citing *Pitchfork Land & Cattle Co. v. King*, 346 S.W.2d 598, 603 (Tex. 1961)).

## C.    Employment Agreement

At the outset of our analysis, we observe that there is no statute or other authority generally prohibiting a "health organization corporation" or any other type of nonprofit entity from being considered an "employer" for purposes of vicarious liability. *See* TEX. BUS. ORGS. CODE ANN. § 22.056 (governing health organization corporations). And here, there is no suggestion or evidence that RMF exercised actual control of Burke's performance when he operated on Lugo's daughter. Therefore, we review the parties' employment agreement to determine whether there is an "explicit contractual assignment" of the right to control so as to render Burke an employee of RMF for purposes of vicarious liability. *See Shell Oil Co.*, 138 S.W.3d at 292.

Generally, the goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used. *Great Am. Ins. v. Primo*, 512 S.W.3d 890, 892–93 (Tex. 2017). We examine and consider the entire writing in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

The agreement at issue here is entitled "Physician Employment Agreement," and it clearly and consistently refers to Burke as an employee of RMF, not an independent contractor. Further, it is undisputed that RMF paid Burke as an employee, as evidenced by a W-2 form attached to Lugo's summary judgment response. Lugo contends that "[a] contract expressly providing that a person is an employee or independent contractor is

6

determinative of that relationship." *See Farlow*, 284 S.W.3d at 911 ("A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties." (citing *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590 (Tex. 1964))). But the case law makes clear that our inquiry must go beyond the terminology used in the contract. *See id.*; *see also Newspapers, Inc.*, 380 S.W.2d at 590 (observing that an agreement which "definitely fixed" a worker's status as an independent contractor "will not prevent the existence of a master-servant relationship when such contract is a mere sham or a cloak designed to conceal the true legal relationship between the parties"). Instead, "[t]he true test remains the right of control." *Newspapers, Inc.*, 380 S.W.2d at 592.

In arguing that it did not have the right to control the details of Burke's work as a physician, RMF relies on the following provision in the agreement:

> 1.1. <u>Duties of Physician</u>. . . . Physician shall provide the professional medical services described in Exhibit A, attached hereto and incorporated by this reference (the "Medical Services"), as well as the administrative duties and responsibilities described in Exhibit A, in accordance with the terms and conditions set forth in this Agreement. It is expressly understood and agreed that Company shall have reasonable discretion to modify the Practice Sites from time to time in consultation with Physician if such changes will result in a change of Physician's practice location(s). Physician shall be subject to Company's employment policies, directives, rules and regulations in effect from time to time, including how and in what manner the Practice Sites will be operated by Company; provided, however, that *at all times Physician shall retain the right to exercise Physician's independent medical judgment in providing the Medical Services to patients.*

(Emphasis added.) According to RMF, this provision exhibits the parties' "intent to follow" the "general rule" that "physicians are considered 'independent contractors.'" *See Espalin v. Children's Med. Ctr. of Dall.*, 27 S.W.3d 675, 684 (Tex. App.—Dallas 2000, no pet.)

7

("As a general rule, physicians are considered to be independent contractors with regard to the hospitals at which they enjoy staff privileges.")[4]

In response, Lugo notes that, though the contract states that Burke retains the right to exercise his "independent medical judgment," it also contains substantive requirements restricting the manner in which he performs medical services for RMF. For example, the agreement requires Burke to "perform the Medical Services . . . within the currently approved methods and standards of practice for the Medical Services in the medical community." Exhibit A to the agreement, entitled "Description of Duties and Responsibilities," does not explicitly define "Medical Services" but states in relevant part:

> Physician hereby represents to Company that Physician has the training, experience and medical knowledge and acumen to render the Medical Services in the Specialties to patients in a competent, effective and efficient manner, and that Physician is qualified to perform, and will use Physician's best efforts to perform, the duties and responsibilities described below:
>
> 1. Render the Medical Services in the Specialties to patients at the Practice Sites as directed by Company, in a manner in which such services are normally provided by a physician in Physician's Specialties and in accordance with Company's protocols, policies and procedures in effect from time to time.
>
> 2. Physician shall be required to provide the Medical Services in the Specialties on a fulltime basis (at least forty (40) hours per week) to

---

[4] In asking us to apply this "general rule," RMF cites myriad cases in which courts found a physician to be an independent contractor of a hospital—but none of them involve a "Physician Employment Agreement" that clearly and repeatedly refers to the physician as an employee. *See Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006); *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 864 (Tex. 2009) ("[I]t was undisputed that [physician] was not an employee of the hospital through whose actions the hospital acted."); *Clemons v. Citizens Med. Ctr.*, 54 S.W.3d 463, 468 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) ("Appellants brought forth no evidence to counter [hospital]'s summary judgment evidence showing the doctors to be independent contractors."); *Espalin v. Children's Med. Ctr. of Dall.*, 27 S.W.3d 675, 684 (Tex. App.—Dallas 2000, no pet.) (patients were notified that "Physicians who treat patients in this facility are not employees of [hospital] but are independent contractors or employees of other institutions."); *see also Alaniz v. Christus Spohn Health Sys. Corp.*, No. 13-20-00001-CV, 2021 WL 2978712, at *4 (Tex. App.—Corpus Christi–Edinburg July 15, 2021, no pet.) (mem. op.) ("[T]here is no indication that [physician] was anything other than an independent contractor."); *Johnston v. Christus Spohn Health Sys. Corp.*, No. 13-14-00418-CV, 2015 WL 10574287, at *8 (Tex. App.—Corpus Christi–Edinburg Mar. 31, 2015, no pet.) (mem. op.) (hospital "used a consent form that expressly disavowed any employer/employee relationship with its physicians").

Company and its patients, at the Practice Sites or at DHR, as may be directed by Company. . . .

6.      Physician will complete all patient medical records and discharge summaries within ninety-six (96) hours, exclusive of paid time off, weekends, and CME, in accordance with Company's applicable bylaws, policies, and procedures and/or DHR or the applicable Practice Site, unless allowance for such period of time would violate federal, state, or Joint Commission standards. Physician will complete operative or high-risk procedure reports in accordance with applicable Joint Commission standards for Hospital Accreditation. Physician agrees to document patient visits in accordance with all federal, state and payor regulations. Patient visit documentation will be completed by Physician by the end of the first business day following the visit day. . . .

16.    Physician will make best efforts to attend 75 percent of and actively participate in DHR's medical staff committees as assigned by DHR's medical staff from time to time. . . .

17.    Physician will rotate through any outpatient clinics that are developed by or on behalf of [RMF] as may be reasonably requested by Company from time to time. . . .

18.    Physician shall perform Physician's duties and responsibilities described in this Agreement faithfully, diligently and in a professional and efficient manner. . . .

19.    Physician shall observe and comply with all reasonable rules, regulations, procedures, policies and bylaws of Company, including any rules specific to any Practice Site. . . .

21.    Physician shall treat patients in accordance with treatment protocols of the American Society of Pediatric Neurosurgeons, the American Board of Pediatric Neurological Surgery, and all applicable rules of the Federal Drug Administration. . . .

23.    Physician will practice using standard coding practices and agrees to cooperate with Company and participate in any review, analysis, or audit of coding practices to the extent required by Company. . . .

24.    Physician will follow policies of Company, as may be revised from time to time.

Lugo additionally points to the following provision in the agreement:

[W]ith the approval of Company, Physician may expend reasonable amounts of time in teaching, lecturing, scientific and clinical study activities,

9

and charitable and professional activities (the "Other Activities"), so long as the Other Activities do not interfere with the performance of Physician's full-time duties and obligations pursuant to this Agreement . . . . Physician may not hold Physician out as Company's employee while engaged in any Outside Activities, and Physician must obtain and maintain a separate malpractice policy because *Physician will not be covered by Company's malpractice policy when engaged in any Outside Activities as they are outside the scope of Physician's employment with Company*.

She argues that this provision "expressly contemplates" that RMF would obtain malpractice insurance coverage for medical services provided by Burke as part of his employment. Indeed, according to documents which were attached to Lugo's summary judgment response, RMF had two insurance policies which covered "Healthcare Professional Liability" for its employees, one of which included coverage for the liability of "any . . . employee . . . when acting within the course and scope of his duties."

Lugo contends that RMF's construction of the agreement would "render[] dozens of references [in the contract] to an employment relationship meaningless." *See J.M. Davidson, Inc.*, 128 S.W.3d at 229. She argues that, under RMF's reasoning, it would be "impossible for *any* employer to be vicariously liable for *any* act of negligence." She cites *Dalehite v. Nauta*, in which the Fourteenth Court of Appeals considered whether a physician was a government employee for purposes of the Texas Tort Claims Act (TTCA). 79 S.W.3d 243 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). The TTCA defines "employee" as

> a person, including an officer or agent, who is in the paid services of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

Tex. Civ. Prac. & Rem. Code Ann. § 101.001(1). In *Dalehite*, the plaintiffs filed a wrongful death suit against a neurosurgeon and the university at whose hospital he worked. 79

10

S.W.3d at 244. The trial court granted a plea to the jurisdiction in favor of the university based on governmental immunity. *Id.* The surgeon argued that, because he is an employee of the university, the suit against him should be dismissed pursuant to the TTCA's election-of-remedies provision. *Id.* (noting that TTCA § 101.106 "require[s] dismissal of claims against governmental employees when claims against their governmental employer are dismissed on immunity grounds"). The plaintiffs argued that the surgeon was not an "employee" because the university "does not have the legal right to control [his] surgeries." *Id.* The court disagreed with the plaintiffs, observing that the surgeon

> was chairman of the [the university's] department of neurosurgery; worked full-time as a professor of neurosurgery, treating patients and instructing medical students at [the university]; signed an employment contract, was paid a salary, and provided with employee benefits and insurance; and received an office, support staff, and equipment necessary to do his work from [the university].

*Id.* at 245. The court of appeals reasoned as follows:

> While [the university] did not control the details of the diagnosis or treatment performed by [the surgeon], the [plaintiffs]' argument that this makes him an independent contractor proves too much. If their argument were correct, then no physician could ever be an employee, not even via ostensible agency. Moreover, government workers exercising any kind of discretionary judgment (such as legislators, judges, and many others) could never be "employees," and thus never immune from suit.

*Id*. at 245–46 (citation omitted).

In a similar case, the Texas Supreme Court held that a neurosurgeon was properly considered an employee of a public teaching hospital under the TTCA even though he "exercise[d] independent judgment in treating patients." *Murk v. Scheele*, 120 S.W.3d 865, 866 (Tex. 2003). The plaintiffs there argued that the surgeon's "exercise of independent professional judgment as a treating physician was outside [the hospital]'s

11

right of control, thereby excluding him from the statutory definition of 'employee.'" *Id.* at 867. The Court held:

> This argument sweeps far too broadly. The [TTCA]'s definition of "employee" does not require that a governmental unit control *every* detail of a person's work. The operator of a motor vehicle, for example, must exercise independent judgment, but this does not mean that he or she cannot be considered an employee under the [TTCA]. If it did, a governmental unit could never be "liable for . . . injury . . . proximately caused by . . . the negligence of an employee . . . aris[ing] from the operation or use of a motor-driven vehicle", even though [§] 101.021(1) of the [TTCA] provides for such liability. Similarly, a physician whose practice is controlled by a governmental unit is not precluded from being an "employee" within the meaning of the [TTCA] simply because he or she must exercise some independent medical judgment.

*Id.* (ellipses in original, footnote omitted) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A)). The Court noted that the surgeon "practiced only for [the hospital] as a member of [its] faculty; that "[a]ll of his compensation came from [the hospital]"; and "[m]ost importantly," that "his medical decisions in the treatment of patients were subject to regimens prescribed by [the hospital] (such as required daily rounds), faculty supervision and review, and in some instances, veto by [the hospital]'s senior faculty." *Id.* The Court concluded: "While the nature of his practice as a physician required him to make many medical decisions using his own professional judgment, the necessity for that judgment did not, by itself, vitiate [the hospital]'s right to control the details of his practice." *Id.*

The Texas Supreme Court again considered whether a physician was an employee for TTCA purposes in *Marino v. Lenoir*, 526 S.W.3d 403 (Tex. 2017). As in *Murk*, the physician (a "second-year medical resident") asserted she was entitled to dismissal under § 101.106 because she was an employee of a non-profit foundation which was "involved in the administration of" the residency program. *Id.* at 404–05. She

emphasized that, under a handbook incorporated into her contract," the foundation "reserve[s] the right to change any requirements affecting the terms and conditions of employment" of resident physicians. *Id.* at 409. "Applying the reasoning of *Murk*," the *Marino* Court held that the physician was not an employee of the foundation because "the details of [her] tasks as a resident physician were, under the relevant contract and other documents and in actual practice, controlled by UTHSCH [the University of Texas Health Science Center at Houston] and its physicians, not the Foundation." *Id.* at 408. The Court observed:

> UTHSCH, through its Program Director and clinic medical staff, controlled the daily rotations, duties, and responsibilities of residents in its residency program. The Foundation paid [the physician] and performed certain routine administrative functions such as record-keeping, but we do not think these functions rose to the level of controlling [her] daily tasks as a physician, her chosen occupation. . . . The evidence shows that the details of [the physician]'s work were in fact supervised and assigned by UTHSCH personnel, as the Handbook specifies, rather than personnel of the Foundation.

*Id.*

The instant case does not involve the TTCA, but the TTCA definition of employee is virtually identical to the common law definition of employee, which is applicable in this case. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(1), *with Limestone Prods.*, 71 S.W.3d at 312. And the facts of this case are clearly more similar to *Dalehite* and *Murk* than *Marino*. Like the physicians in *Dalehite* and *Murk*, Burke worked full-time under a contract with RMF, received equipment necessary to do his work from RMF, received health insurance and retirement benefits from RMF, and was paid only by RMF. Further, Burke's "medical decisions in the treatment of patients were subject to regimens prescribed" by RMF, including a requirement that he "make best efforts to attend 75 percent of" and actively participate in DHR's medical staff committees, and a requirement

13

that he "rotate through any outpatient clinics" that RMF may develop. *See Murk*, 120 S.W.3d at 867. RMF's right under the agreement to control the details of Burke's work is far more detailed and extensive than the control enjoyed by the entity at issue in *Marino*, which was limited to the "right to change any requirements affecting the terms and conditions of employment." *See Marino*, 526 S.W.3d at 409.

Application of the factors identified by the Texas Supreme Court leads us to the same conclusion. RMF furnished Burke with all necessary tools, supplies, and materials to perform the job; it required Burke to provide medical services for at least forty hours a week; it had discretion to change the sites at which he practiced; and it paid Burke a regular salary for his services. *See Limestone Prods.*, 71 S.W.3d at 312. Moreover, the "Physician Employment Agreement" required Burke to "complete patient medical records and discharge summaries within ninety-six (96) hours"; to comply with "all reasonable rules, regulations, procedures, policies and bylaws of" RMF; and to "practice using standard coding practices." The fact that Burke retained the right to exercise his "independent medical judgment" in treating patients does not "vitiate [RMF]'s right to control the details of his practice." *Murk*, 120 S.W.3d at 867. That argument "sweeps far too broadly" and "proves too much." *Id.*; *Dalehite*, 79 S.W.3d at 245–46.

In any event, the agreement in this case also purported to restrict the manner in which Burke rendered medical services. In particular, it required him to perform medical services: (1) "within the currently approved methods and standards of practice for the Medical Services in the medical community"; (2) "in a manner in which such services are normally provided by a physician in [his s]pecialt[y] and in accordance with [RMF]'s protocols, policies[,] and procedures"; (3) "faithfully, diligently[,] and in a professional and

14

efficient manner"; and (4) "in accordance with treatment protocols of the American Society of Pediatric Neurosurgeons, the American Board of Pediatric Neurological Surgery, and all applicable rules of the Federal Drug Administration." The presence of these restrictions indicates that, although Burke ostensibly retained the right to exercise his independent medical judgment in treating patients, that right was not absolute. *See J.M. Davidson, Inc.*, 128 S.W.3d at 229 (noting that we must consider the entire writing in an effort to harmonize and give effect to all of its provisions).[5]

Finally, taking a broader view of the relationship between RMF and Burke, we emphasize that those parties deliberately chose to use the term "employee" in their agreement. They could have used the term "independent contractor," but they did not.[6] Although the terminology used in the agreement is not necessarily controlling, *Newspapers, Inc.*, 380 S.W.2d at 582, the exclusive use of "employee" in this case is strong evidence that the parties to the agreement intended for Burke to be considered an employee. *See Great Am. Ins.*, 512 S.W.3d at 892–93; *J.M. Davidson, Inc.*, 128 S.W.3d at 229; *see also Farlow*, 284 S.W.3d at 911 ("Evidence that the parties did not intend for an independent contractor relationship can come from the contract itself.").[7] On the other

---

[5] RMF additionally contends it is not vicariously liable because it did not have the right to control "the allegedly negligent acts" specifically alleged by Lugo. *See Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911–92 (Tex. App.—Fort Worth 2009, pet. denied) (noting that, "[t]o trigger vicarious liability, the right to control must extend to the specific activity from which the injury arose"). We disagree. RMF argues that it had no right to control the details of Burke's work, but it does not dispute that it had the right to demand that Burke perform medical services in accordance with applicable standards and treatment protocols. To be more specific: RMF had the right to direct Burke not to cause or allow a retractor to be left in a patient's brainstem.

[6] In the 28-page agreement, the words "employee," "employer," and "employment" are used forty-five times. The term "independent contractor" is used only once—in a section stating that Burke shall not "directly as a partner, employer, agent, independent contractor[,] or employee" solicit RMF's patients to "leave the care of [RMF]."

[7] The "Physician Employment Agreement" is not ambiguous as to Burke's status, but if it were, RMF's insurance policies covering "Healthcare Professional Liability" for its "employees" would also be

15

hand, there is no evidence—nor is there any explicit suggestion—that the repeated references to Burke's status as an employee in the agreement is a "sham or subterfuge designed to conceal the true legal status of the parties." *See Newspapers, Inc.*, 380 S.W.2d at 590; *Farlow*, 284 S.W.3d at 911. We conclude that Burke was an employee of RMF for purposes of vicarious liability for Burke's alleged negligence.

**D.     Course and Scope of Employment**

RMF further contends that, even if Burke is generally considered its employee, it is not vicariously liable for his negligence in this case because he was not acting within the course and scope of his employment when he committed the alleged negligent acts. *See Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947.

RMF's articles of incorporation, executed in 2005, state that it "is a non-profit corporation as defined in Paragraph A(3) of Article 1396-1.02 of the Texas Non-Profit Corporation Act." That statute defined "non-profit corporation" as "a corporation no part of the income of which is distributable to its members, directors, or officers." Act of Apr. 27, 1959, 56th Leg., R.S., ch. 162, art. 1.02(A)(3), 1959 Tex. Gen. Laws 286 (expired Jan. 1, 2010) (current version at TEX. BUS. ORGS. CODE ANN. § 22.001(5)). Section 22.056 of the Texas Business Organizations Code, entitled "Health Organization Corporation," states as follows:

> (a)     Doctors of medicine and osteopathy licensed by the Texas Medical Board, podiatrists licensed by the Texas Department of Licensing and Regulation, and chiropractors licensed by the Texas Board of Chiropractic Examiners may form a corporation that is jointly owned, managed, and controlled by those practitioners to perform a professional service that falls within the scope of practice of those

---

evidence that RMF intended for its physicians to be considered "employees." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011) ("Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument.").

16

practitioners and consists of:

   (1)   carrying out research in the public interest in medical science, medical economics, public health, sociology, or a related field;

   (2)   supporting medical education in medical schools through grants or scholarships;

   (3)   developing the capabilities of individuals or institutions studying, teaching, or practicing medicine, including podiatric medicine, or chiropractic;

   (4)   delivering health care to the public; or

   (5)   instructing the public regarding medical science, public health, hygiene, or a related matter.

(b)   When doctors of medicine, osteopathy, podiatry, and chiropractic form a corporation that is jointly owned by those practitioners, the authority of each of the practitioners is limited by the scope of practice of the respective practitioners and *none can exercise control over the other's clinical authority granted by their respective licenses, either through agreements, the certificate of formation or bylaws of the corporation, directives, financial incentives, or other arrangements that would assert control over treatment decisions made by the practitioner*.

TEX. BUS. ORGS. CODE ANN. § 22.056 (emphasis added). RMF argues that, pursuant to this statute, it is legally prohibited from "assert[ing] control over treatment decisions made by the practitioner."

RMF cites *DHR v. Andrade*, in which the Texas Supreme Court considered "whether a limited partnership that owns a hospital may be vicariously liable for the alleged professional negligence of a doctor who is a limited partner in the partnership." 493 S.W.3d 545, 546 (Tex. 2016). The Court held that, under the applicable section of the business organizations code, the partnership itself could not be held vicariously liable because: (1) "the ordinary course of [the partnership]'s business does not include the provision of medical care," and (2) the doctor was not acting "with the authority of the

17

partnership." *Id.* at 548–51 (applying TEX. BUS. ORGS. CODE ANN. § 152.303(a)). It reasoned that "[o]nly a person, not a partnership, may be licensed to practice medicine," and that the partnership agreement at issue "does not give the limited partners . . . any authority to provide medical care at partnership-owned facilities." *Id.* at 548, 550.

*Andrade* is distinguishable from this case for two reasons. First, in order to establish the partnership's liability, the plaintiff in that case had to show that the doctor committed actionable conduct "in the ordinary course of business of the partnership." *See id.* at 547–48; *see also* TEX. BUS. ORGS. CODE ANN. § 152.303(a)(1). The Court held that the plaintiff failed to do this because: (1) the partnership was legally prohibited from practicing medicine or providing "medical care"; (2) the partnership agreement at issue "expressly states that it is to be construed in accordance with Texas law and that Texas law controls to the extent that it conflicts with the terms of the agreement"; and (3) the agreement "does not contemplate the inclusion of illegally practicing medicine in the ordinary course of the partnership's business." *Andrade*, 493 S.W.3d at 548.

Here, Lugo does not need to show that Burke's alleged negligence occurred in the *ordinary course of business* of RMF; rather, she had to show that the alleged negligence occurred *within the course and scope of Burke's employment* by RMF. *See Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947; *Goodyear Tire & Rubber Co.*, 236 S.W.3d at 757. For purposes of an employer's vicarious liability, "within the course and scope of employment" means that the allegedly tortious act "falls 'within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired.'" *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018) (quoting *Mayes*, 236 S.W.3d at 757). The act "must be of the same

18

general nature as the conduct authorized or incidental to the conduct authorized." *Id.* "Accordingly, if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Id.* RMF argues that, like the partnership at issue in *Andrade*, its "ordinary course of business" does not include the practice of medicine or providing "medical care." Even assuming that is true, it is undisputed that Burke was hired for the specific "object" of "provid[ing] . . . professional medical services," and the alleged negligence took place while he was performing such services. He did not "deviate[] from the performance of his duties for his own purposes." *See id.*

Second, though the *Andrade* Court concluded that a partnership is legally prohibited from practicing medicine or providing "medical care," 493 S.W.3d at 548, RMF is not a partnership. RMF notes that "[a] health organization certified under [§] 162.001(b) may not interfere with, control, or otherwise direct a physician's professional judgment in violation of this subchapter or any other provision of law, including board rules." TEX. OCC. CODE ANN. § 162.0021.[8] But the fact that RMF may not legally interfere with or control

---

[8] Section 162.001(b) of the Texas Occupations Code states:

The [Texas Medical Board] shall approve and certify a health organization that:

(1)      is a nonprofit corporation under the Texas Non-Profit Corporation Act . . . organized to:

         (A)      conduct scientific research and research projects in the public interest in the field of medical science, medical economics, public health, sociology, or a related area;

         (B)      support medical education in medical schools through grants and scholarships;

         (C)      improve and develop the capabilities of individuals and institutions studying, teaching, and practicing medicine;

         (D)      deliver health care to the public; or

         (E)      instruct the general public in medical science, public health, and hygiene and provide related instruction useful to individuals and beneficial to the

Burke's professional judgment has no bearing on the question of whether the alleged negligence took place within the course and scope of his employment. In any event, as RMF acknowledges, a "nonprofit health corporation certified under Section 162.001, Occupations Code" is considered a "physician" under the definition provided in the Texas Medical Liability Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(23)(D); TEX. OCC. CODE ANN. § 162.001(b).

For the foregoing reasons, we conclude that Burke was acting within the course and scope of his employment with RMF when he committed the alleged negligent acts as set forth in Lugo's lawsuit.

### III. CONCLUSION

We overrule RMF's issue on appeal and affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
15th day of June, 2023.

---

                community;

(2)      is organized and incorporated solely by persons licensed by the board; and

(3)      has as its directors and trustees persons who are:

    (A)      licensed by the board; and

    (B)      actively engaged in the practice of medicine.

TEX. OCC. CODE ANN. § 162.001(b). This parallels the definition of "health organization corporation" as set forth in § 22.056 of the business organizations code. *See* TEX. BUS. ORGS. CODE ANN. § 22.056(a) As noted, RMF's articles of incorporation state only that it is a non-profit corporation. RMF points to no summary judgment evidence establishing that it is a certified "health organization" under § 162.001(b) of the occupations code, nor does it point to any evidence establishing that it is a "health organization corporation" under § 22.056 of the business organizations code. That said, Lugo does not dispute these factual allegations.